**H. Parker STANLEY, Appellant,**

v.

**BOARD OF PROFESSIONAL RESPON-
SIBILITY OF the SUPREME COURT
OF TENNESSEE, Appellee.**

Supreme Court of Tennessee,
at Knoxville.

Oct. 4, 1982.

Rehearing Denied Oct. 25, 1982.

Edward Michael Ellis, Knoxville, for appellant.

Theresa A. Townshend, Nashville, for appellee.

OPINION

FONES, Chief Justice.

The Board of Professional Responsibility charged Harry Parker Stanley with preparation of usurious notes, the lending of money to a client without full disclosure, the failure to deal honestly and candidly with clients, the representation of both the victim and defendant in a criminal matter, incompetency for legal representation, and conflict of interest. The charges were based upon Stanley's conduct in three separate episodes.

The charges, resulting in Stanley's permanent disbarment, were heard by a hearing committee consisting of three lawyers practicing in District Two wherein Stanley resided and practiced. Stanley appealed to the Circuit Court of Anderson County, and upon the transcript made before the hearing committee consisting of 430 pages and additional proof consisting of 135 pages, Chancellor Wilkes Thrasher, sitting specially, affirmed the judgment of the hearing committee.

Stanley was thirty-three years old at the time of the circuit court hearing. He was admitted to the bar in April 1971, and entered practice with Jimmy D. Turner, in the City of Oak Ridge, Anderson County. Seven months later he opened his own office and has since practiced alone.

I.

John E. Newby was described by Stanley and Mrs. Shirley Newby as a friend and client of Stanley. Newby was a pharmacist, the owner of Union Prescription Shop in Oak Ridge. One of the witnesses testified that Newby's hobby was spending money. His widow testified that he opened ten drug stores and one camera shop during the last fifteen years of his life and all failed except three; that he was a poor businessman and constantly in financial difficulty.

Stanley testified that beginning about four years before Newby's death in December, 1978, he would lend Newby twenty, fifty or one hundred dollars and would be repaid promptly. Apparently Stanley would be given a note if the amount was as much as one hundred dollars with various items of personal property as collateral. Stanley testified, at one point in the record, that with respect to those loans, either no interest or ten percent interest was charged. Newby died on December 18, 1978. On December 22, 1978, Shirley New-

by filed suit against Stanley in the Circuit Court of Anderson County alleging that she and her late husband had borrowed money from Stanley and had given notes that were usurious on their face and that Stanley held jewelry, diamond rings, and other personal property valued in excess of ten thousand dollars, which was described in detail in the petition. She sought and obtained an order restraining Stanley from disposing of the property. The usurious notes were described in this record as follows:

1. A note dated August 22, 1978, in the principal sum of $560.00 bearing interest at twelve percent per annum with an additional ten percent penalty charge for late payment;

2. A note dated August 24, 1978, in the principal sum of $672.00 with interest at twelve percent plus an additional ten percent penalty for late payment.

3. A note dated August 30, 1978, in the principal sum of $2,446.50 bearing interest at twelve percent per annum with an additional ten percent penalty for late payment;

4. A note dated September 30, 1978, in the principal sum of $2,563.00 bearing interest at twelve percent per annum with the same penalty for late payment as the preceding notes; and

5. A note dated September 8, 1978, in the principal sum of $7,641.00 bearing interest at the rate of fifteen percent per annum.

The maximum interest rate at the dates of each of said notes was ten percent per annum. Mrs. Newby testified that Stanley supplied the money for the principal amount of each of those notes. Stanley testified that the money loaned belonged to his mother. He admitted that he negotiated all the loans, prepared the notes, transmitted the funds to Newby, and made the collections that were made.

On January 12, 1979, Mrs. Newby's lawsuit against Stanley was settled by entry of an order reciting that Stanley would return all of the property held as collateral to Mrs. Newby and neither party would file or prosecute any suit based upon notes or security instruments executed by Mr. or Mrs. Newby payable to Stanley or his mother. No other terms of the settlement were revealed either in the order or in the testimony of the witnesses in this case.

Stanley's defense was that the interest charge that exceeded ten percent was a service charge. Stanley testified that, at Newby's insistence, Stanley obligated himself to notify Newby a few days in advance of the due dates of payments on the respective notes, and "then appear in person at his place of business in order to collect payment." He further said that Newby "could mail a payment and mail in ten percent at any time." No such terms appeared in the notes and there was no evidence that Newby mailed in payments at only ten percent interest.

Stanley testified that he was a frequent customer and friendly visitor of Newby's at the Union Prescription Shop. Mrs. Newby also testified that Stanley frequently dropped in the shop. The chancellor found that any services rendered by Stanley in the respects mentioned were of nominal value, if any, and would not purge the transactions of usury. There was absolutely no corroboration, circumstantial or otherwise to support the service charge arrangement.

At another point in the record Stanley suggested that some of the excess interest beyond the legal rate was charged in the larger notes because in prior years Stanley had made "out of pocket loans" of twenty, fifty or one hundred dollars and charged no interest whatsoever.

Stanley also insisted there was no conflict of interest involved in the usurious loan transactions with his client, because there was no lawyer-client relationship, as to those transactions. That conclusion was based on Stanley's testimony that he made the loans to decedent in the role of a friend, not a lawyer; that decedent did not expect or receive any "independent advice" from Stanley in connection with the loan transactions and nothing was misrepresented or withheld from Newby. That was also a patently spurious attempt to avoid the con-

sequences of a lawyer entering into an illegal transaction with a client wherein the lawyer and the client had conflicting interests.

## II.

The next episode involved two clients, Janet Whittlesay and her nineteen-year-old friend, Ronnie Green.

According to an Oak Ridge police report that was introduced into evidence, Janet Whittlesay reported the theft of stereo equipment, albums and clothes, valued at approximately seven hundred dollars from the residence where she lived with one Ronald Stevens. After reporting the theft she discovered that her friend Ronnie Green had taken the items and removed them to his home in Cleveland, Tennessee. Whittlesay recovered all of the property and informed the police that she did not want to prosecute, whereupon someone in the police department allegedly threatened her with prosecution for obstructing justice and withholding information.

Ms. Whittlesay sought legal advice from Stanley who testified he did a "limited amount of legal research on the matter of obstruction of justice." In addition, he made two visits to the Oak Ridge Police Department to Sergeant Faust, who apparently made the threat to Ms. Whittlesay. Stanley said that Faust told him, on the first visit, that he was leaving for the day and left him with the impression that he was not interested in the case, but said come back tomorrow. On the next visit Faust was busy and refused to see Stanley. Stanley left a message for Faust that if he was interested in the case he should telephone Stanley. He never heard from Faust thereafter.

For those services to Ms. Whittlesay, Ronnie Green paid Stanley one hundred dollars.

It is not clear from this record who first came up with the idea that Ronnie Green needed the services of a lawyer, but it is clear that Stanley approved of and promoted that idea.

Stanley took Ms. Whittlesay and Green to one Edward M. LaMotte, who was described as a pastoral counsellor. Stanley's version of the visit was that the initial purpose was to help Whittlesay determine whether or not to prosecute Green; that after thirty to forty-five minutes Whittlesay, "resolutely and firmly," came to the conclusion that she would not prosecute Green. But, according to Stanley, it became apparent to LaMotte that Green had "deep seated and serious problems." Then, he continued, "the four of us came to the conclusion ... that he would need ... some type of full-time treatment." Stanley asserted that Green had a drug and alcohol problem.

Stanley testified that Green became his client at LaMotte's place on the Friday evening of the first visit there, in the presence of Whittlesay and LaMotte, prior to Stanley's having met Green's parents. Stanley described the purpose of the employment as follows:

"Q   This was before you had an opportunity to speak with his parents?

A   That is correct. In other words, what he wanted, he wanted my services to reinforce or to act as a paraclete, act as a supporter to advise him of various legal consequences of his acts. He also desired to have Mr. LaMotte stand by to help him. To be the primary counsellor outside of the staff that would be available to him at Freedom House, and also desired to have a counsellor that worked under Mr. LaMotte, and also a counsellor, not an attorney or psychiatrist or doctor, whose role it would be to visit with him and counsel with him at Freedom House in that particular setting, either have that particular agent or Mr. LaMotte himself counsel with him at that particular point.

It was suggested and he desired to have as many people supporting him as he could possibly obtain and that he would need that kind of support."

Stanley was asked if anything remained to be performed as lawyer for Ms. Whittlesay at the time of his employment by Ron-

nie Green. His response was, "Only ... to make it plain to the police that she had no desire to prosecute Ronnie Green."

On the Saturday following the Friday night meeting with LaMotte, Stanley met with Richard and Bobbie Jean Green, Ronnie Green's parents. Richard Green testified that his son told them Saturday morning that he was in trouble and had an appointment with Stanley at one p.m.; that Stanley had sworn him to secrecy about the nature of the trouble; that when they went to Stanley's office that afternoon Stanley refused to tell them what the trouble was until they paid him a fee; that initially a fee of two thousand dollars was demanded but was later reduced to seven hundred and fifty dollars with a demand for immediate payment; that when informed that they would have to borrow the money from the credit union and that that office was closed until Monday, Stanley insisted that he could procure them an immediate loan which could be repaid from the proceeds of the credit union loan on Monday, that at Stanley's insistence that plan was carried out, to-wit: they gave a note for the loan procured by Stanley for them and brought him the credit union's check for seven hundred fifty dollars on Monday.

The only service rendered by Stanley was to take the Greens and their son back to LaMotte for a counselling session and obtain Ronnie Green's admission to a half-way house where he remained for approximately three weeks. It is crystal clear from the record that the counselling session and admission to a half-way house was accomplished by Stanley keeping alive the threat that Ronnie had committed a serious crime and might yet be sent to the penitentiary. It is not clear at what point in time the Greens realized they had been misled but the following testimony of Mrs. Green under cross examination by counsel for Stanley reflects their ultimate understanding:

"Q  You recognized that as being an act against the law, the act itself?

A  Yes sir. He did break the law, but Mr. Stanley did nothing legally, as far as I know, and I don't know much about lawyers, as far as this goes, but, as far as I know, Mr. Stanley did nothing. Everything was well taken care of before my husband and I were called in on this.

The stereo was taken back. Janet didn't want to prosecute. All of this had been taken care of before my husband and I were brought in."

Stanley deceived an immature youth and his naive parents. He compounded the deception with his lack of understanding of the proper role of a lawyer—which does not include a self-appointed role as a paraclete, comforter, helper, or hand holder, under the guise of legal services and at a lawyer's compensation rate.

Stanley's lack of understanding of conflicts of interest to be avoided by lawyers is exemplified in the following paraphrased questions and answers:

Q  Did you lead Ronnie's parents to believe that unless they employed you he might go to the penitentiary.

A  The plan I had constructed provided the "highest reasonable probability to avoid his having to go into the penitentiary."

Q  Did you consider that if your plan did not work out successfully, that there might be a criminal trial for Ronnie Green and Janet Whittlesay would be the prosecutor?

A  I explained that to them, that that would literally be possible. They knew that was a possibility but Janet said she wouldn't do it.

Q  Despite knowing that and having first represented Miss Whittlesay you accepted employment to represent Ronnie Green in the same matter?

A  With all due respect, I did not see it as the same matter.

### III.

Stanley testified that Russell Orr first retained his services to avoid being prosecuted for passing bad checks. The learned Chancellor's recitation of the relevant facts about this third episode is fully supported

by the record, and we adopt the same, together with his conclusions and judgment. That portion of his opinion reads as follows:

"Mrs. Reba June Wallace was a widow with a seventh grade education and at times material to this case she dated Mr. Russell V. Orr when she first came in contact with Mr. H. Parker Stanley. Mr. Orr at that particular time was a bartender at Jerry's Bar on Clinton Highway in late 1977 or early 1978 when some of these transactions materialized. Reba June Wallace subsequently did marry Russell V. Orr and became Mrs. Reba June Wallace Orr.

Mr. Stanley is charged with a conflict of interest in representing Mr. Orr when Mr. Orr had bad checks and sought his help and when loans were made to Mr. Orr, and then it is charged that Mr. Stanley also represented his mother in the case of Stanley versus Orr with respect to back rent due to his mother from Mr. Orr, and generally the charges of the Disciplinary Board also state that Mr. Stanley's conduct in this regard also reflected upon his fitness to practice law. Without burdening this opinion unnecessarily with a maze of facts and details, it does appear that a sum total of thirteen thousand dollars worth of mortgages were placed against the little home of Mrs. Reba June Wallace Orr. Mrs. Orr very positively stated that she did not know the nature of these obligations and that she felt she had been misinformed and that she did not understand the legal import or significance of some of these documents. In any event in due time appropriate legal action was filed on behalf of Mrs. Reba June Orr and these thirteen thousand dollars in obligations were disposed of for approximately one thousand dollars. Mr. Stanley would have the Court believe that this was done as was also done in the Newby case in order not to disturb his ill mother. The Court rejects this theory.

It is also apparent from the Exhibits to Mrs. Reba June Wallace Orr's testimony and from the transcript that the notes payable to Mr. Stanley's mother were usurious as evidenced by the transcript at page 184, line 14, and transcript 190, line 24. Mr. Stanley himself said, 'I told him [Orr] that *we* would renew the note and that at that particular time the note would bear a higher rate of interest than ten percent as ten percent was not sufficient to renew the note. He knew *us* well enough to know that if *we* told him we would, we would renew it. I told him that he could trust us and that we would run it for two years that he could then renew the note. He asked what rate of interest the rate would be at the end of that. I indicated that I thought the maximum rate would then be raised to fourteen and a half to fifteen . . . .' (Emphasis supplied) The Court concludes that the we and the us refers to Mr. Stanley and his mother—this conclusion is inescapable. Mrs. Stanley said that her son did not tell her to insert the interest rate of fourteen and a half percent, but Mr. Orr told her, 'Parker said put fourteen and a half percent as the interest rate.' There's no attached document of explanation with regard to the Orr matter and as in the Newby case the alleged document of explanation has been conveniently discarded or thrown away. Mr. Stanley simply cannot divorce himself from involvement in this Orr transaction. Afterall from the lips of his own mother the Court heard her answer and her deposition at page 28, lines 21 and 22, when she was asked this question, 'Is it true that your son routinely makes the business decisions for you.' Answer unqualifiedly and without any suffix or prefix, she answered yes.

From all of which and from the clear and convincing evidence the Court concludes that Mr. Stanley is guilty of the specifically enumerated improprieties with regard to the Orr-Wallace transactions.

Aside from the specifically designated charges the Court feels that it is appropriate to comment upon the quality of Mr. Stanley's professional services. Again after attentively listening to Mr.

Stanley's testimony and after carefully observing his manner and demeanor on the witness stand the Court concludes that Mr. Stanley's incompetence is exceeded only by his lack of remorse and his inability to recognize his wrong doing.

Nevertheless the Court now returns to the central theme or the major thrust of these proceedings. The Court has re-read the transcript, re-examined the Exhibits, analyzed the testimony by the oral witnesses and by the deposition, and the Court has given due consideration to the arguments of counsel, and the Court concludes that Mr. H. Parker Stanley is guilty as charged by the Disciplinary Board of the Supreme Court. In particular Mr. Stanley is guilty of participation in usurious transactions, of conflict of interest, and is most assuredly guilty of conduct which seriously reflects upon his fitness to practice law."

The judgments of the hearing committee and the Circuit Court of Anderson County permanently disbarring H. Parker Stanley are affirmed. Costs are adjudged against H. Parker Stanley.

COOPER, BROCK, HARBISON and DROWOTA, JJ., concur.

### ORDER

FONES, Chief Justice.

The petition to rehear is respectfully denied.

COOPER, BROCK, HARBISON and DROWOTA, JJ., concur.