CINCINNATI BAR ASSOCIATION *v.* ALSFELDER.

[Cite as *Cincinnati Bar Assn. v. Alsfelder,*
103 Ohio St.3d 375, 2004-Ohio-5216.]

(No. 2003–2080—Submitted March 16, 2004—Decided October 13, 2004.)

---

**Per Curiam.**

{¶ 1} Respondent, Robert F. Alsfelder of Cincinnati, Ohio, Attorney Registration No. 0014829, was admitted to the practice of law in Ohio in 1981. On August 12, 2002, relator, Cincinnati Bar Association, charged respondent with having violated the Code of Professional Responsibility while representing a client who had consulted him about a trust established by her deceased father. A panel of the Board of Commissioners on Grievances and Discipline heard the cause on May 30, 2003. Based on the parties' stipulations, exhibits, testimony, and character reference letters submitted on respondent's behalf, the panel made findings of fact, conclusions of law, and a recommendation.

{¶ 2} The client, a woman in her forties, contacted respondent in the summer of 1998, asking for his legal assistance with her father's trust. The trust

contained assets, primarily real estate and Procter & Gamble stock, valued at least at $2,000,000. Three trustees had been appointed to oversee the trust—the client and two of her cousins.

{¶ 3} The client was the sole income beneficiary of the trust, which was to be paid in monthly or quarterly installments to the client during her lifetime. Upon the client's death, the trust was to be terminated and the principal distributed to her issue. If the client died without children, one-half of the trust principal was to be distributed to her father's next of kin and one-half to her mother's.

{¶ 4} The client had no children and adamantly wanted to control distributions from the trust so that the assets passed into her estate and she could bequeath them to charity or a local park district, disinheriting her cousins. She also wanted to increase the income that she was receiving from the trust. Before retaining respondent, the client had enlisted the services of another attorney, whom she had dismissed because he did not accomplish her objectives. The client subsequently engaged respondent, and on August 25, 1998, they entered into a written fee agreement providing that respondent would be paid $225 per hour.

{¶ 5} The client's income from the trust depended on whatever dividends Procter & Gamble declared on the trust shares each year. On October 14, 1998, respondent represented the client at a meeting at which the trustees agreed to increase the client's annual income from the trust to $75,000, more than double what she had been receiving. To achieve this, the trustees agreed to supplement the Procter & Gamble dividends from the stock by selling some shares of trust stock in a way that did not substantially affect the trust principal.

{¶ 6} Two days later, on October 16, 1998, the client paid respondent $10,000 for the work he had performed before and at the October 14 trustees' meeting. Respondent recalled that he gave his client an itemized account of his services to justify the $10,000 bill, but his client did not remember this, and respondent was unable to locate the original invoice. At the hearing, respondent presented an accounting in which he had attempted to reconstruct his billable hours for the $10,000 fee. He acknowledged, however, that the number of hours for which he could account with contemporaneous time records fell far short of justifying the legal fee.

{¶ 7} Respondent and his client's professional relationship continued from October 16, 1998, until September 2001. The parties stipulated to the fees that the client agreed to pay respondent:

{¶ 8} "On or about October 16, 1998 the fee agreement between Respondent and [the client] was converted to a fixed fee arrangement.

{¶ 9} "The new fee agreement was a $13,000 fixed fee and covered the time period of October 16, 1998 through June 1, 1999. There was no written contract for the fixed fee agreement between Respondent and [the client].

{¶ 10} "Respondent and [the client] entered into a second fixed fee agreement for the period covering June 1, 1999 through June 1, 2000 for the sum of $12,500.

{¶ 11} "Respondent and [the client] entered into a third fixed fee agreement for the period covering June 1, 2000 though June 1, 2001 for the sum of $15,000.

{¶ 12} "Respondent and [the client] entered into a fourth fixed fee agreement for the period covering June 1, 2001 through June 1, 2002 for the sum of $20,000.

{¶ 13} "Between October, 1998 and September, 2001, [the client] paid the Respondent a total of $60,500 in legal fees.

{¶ 14} "On October 16, 2001 [the client] filed a grievance with the Cincinnati Bar Association."

{¶ 15} Respondent testified that his client had asked him in October 1998 to change their agreement from an hourly fee to an annual fixed fee because she wanted to be able to anticipate exactly what her legal expenses would be each year. Respondent explained that he had arrived at the amount of his initial retainer based on his "basic and general appreciation of what the types of things that [his client] was looking for [him] to do." As it turned out, the legal services respondent provided during the period from October 1998 to September 2001 consisted mainly of preparing the client's tax returns annually, having her birth name restored on some deeds, preparing two powers of attorney, preparing her will, preparing a living will, and arranging for a prepaid funeral contract and some burial plots. At some point he checked on the satisfaction of a mortgage that his client had obtained to pay for respondent's initial $10,000 legal fee. At his client's request, he also tried to find a way to avoid the terms of her father's trust and prevent the assets from passing to the client's cousins after her death.

{¶ 16} Respondent proposed adoption as one way the client could prevent the cousins from benefiting from the trust. The client was not interested in adopting a child, and respondent ruled out the possibility of his client's adoption of an adult. The client, however, was interested in another of respondent's strategies—that the client designate as her heir at law an adult friend who would administer her estate in accordance with her wishes.

{¶ 17} Respondent suggested that his client designate an heir under R.C. 2105.15 even though, in his opinion, it was unlikely that this process would successfully circumvent the trust terms. Respondent knew that the court of appeals in his client's district had recently affirmed a rule, established to honor a deceased settlor's intent, that precluded a trust beneficiary's designated heir from inheriting trust assets to the same extent as the trust beneficiary's issue. See *PNC Bank, Ohio, N.A. v. Stanton* (1995), 104 Ohio App.3d 558, 662 N.E.2d 875

(designated heir of a trust beneficiary may inherit from but not through the designator).

{¶ 18} Respondent advised his client that he thought her chances of designating an heir to "break the trust" were "slim"; however, he still hoped to argue away the adverse precedent. Thus, he asked his client to name someone who might be interested in becoming her designated heir. The client suggested an old friend of hers who resided in Phoenix, Arizona. Respondent subsequently took his family on two vacations to Phoenix, planning to discuss the designated heir proposal with the client's friend and account for his part of the trips as a business expense. Respondent made the second trip even though, as he admitted at the hearing, there was no reason for a second face-to-face meeting.

{¶ 19} The client next suggested a neighbor, another long-time friend. In a meeting with respondent, the neighbor questioned the cost and necessity of respondent's services and expressed his misgivings to respondent's client. Shortly after that meeting, the neighbor helped the client compose her grievance letter to relator.

{¶ 20} The parties agree that from October 16, 1998, until his dismissal, respondent's client often contacted him three, four, or more times a day, usually during business hours, but sometimes at night. The client also sometimes insisted on interrupting respondent's consultation with another client. Respondent conservatively estimated that he spent three and one-half to four hours per week attending to his client's concerns during this period.

{¶ 21} The client's communications, however, did not always require legal advice. Instead, respondent concedes that he and his client regularly discussed her personal concerns, frequently also meeting in person, sometimes for lunch or dinner, for these conversations. Before the disciplinary proceedings against him, respondent had considered it ethically appropriate to charge his client for these discussions, explaining to her that he had only an "attorney's time" to give.

{¶ 22} The client agreed to the oral fixed-fee arrangements she entered into with respondent for the period from October 16, 1998, to September 2001, and respondent performed legal work for her during this period, a time when the client often demanded much of his attention. However, many of the client's contacts were merely social and did not require any legal service for which respondent could justifiably charge her. And because respondent did not keep complete records of the time he devoted and the services he provided to this client, he could not substantiate his billing practices.

{¶ 23} The panel thus found by clear and convincing evidence that respondent had violated DR 2–106(A) ("A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee"), 5–101(A)(1) ("Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of professional judgment on behalf of the client will be or

reasonably may be affected by the lawyer's financial, business, property, or personal interest"), and 9–102(B)(3) (a lawyer shall "[m]aintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them").

{¶ 24} In recommending a sanction for this misconduct, the panel found mitigating the fact that respondent had no prior disciplinary record. See Section 10(B)(2)(a) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). Respondent practiced probate, commercial, and real estate law out of his home, assisted at times by his wife and mother-in-law. He served on two area planning commissions. The panel also found mitigating eight letters of reference from members of respondent's local bar and community that extolled his integrity and good character. Three character witnesses also testified on respondent's behalf.

{¶ 25} As aggravating features, the panel found that respondent's client was comparatively vulnerable, inasmuch as she exhibited a lower-than-average capacity for coping with day-to-day activities. BCGD Proc.Reg. 10(B)(1)(h). The board, in adopting this finding, described respondent's client as emotionally and intellectually vulnerable and found that she did not have complicated legal problems to the extent that she needed to keep respondent on retainer for years or pay him a substantial portion of her annual income. The board concluded that respondent had taken advantage of his client to create a fee arrangement inconsistent with her legal needs, allowing the client to consult him as a friend while charging her for his time as a lawyer.

{¶ 26} Relator suggested a six-month suspension of respondent's license to practice law; respondent urged the panel to dismiss the complaint. Accepting neither suggestion, the panel recommended that respondent be suspended from the practice of law for one year and that this suspension be stayed on the condition that respondent return $30,000 to his client during the suspension period. The board adopted the panel's findings of misconduct but recommended that respondent be suspended from the practice of law for a period of one year, with only the last six months of the suspension stayed. The board did not specify in its recommendation that respondent make restitution.

{¶ 27} Upon review, we agree that respondent violated DR 2–106(A), 5–101(A)(1), and 9–102(B)(3) as found by the board. We do not, however, accept the board's recommendation. We find that the public and bar are better served by the panel's recommendation that respondent receive a one-year suspension, stayed on the condition that he make restitution in the amount of $30,000.

{¶ 28} Respondent does not dispute the board's findings of misconduct and concedes that he could not ethically charge for friendly advice that was not directly related to his client's legal concerns. Respondent insists, however, that

he made this mistake with the best of intentions and that by discussing whatever his client wanted, he was having a "positive impact" on her life and "doing her good." To this end, respondent not only provided the services already described, he also talked with his client about "anything and everything" in her life nearly anytime she wanted, day or night. She consulted him about her relationships with boyfriends and relatives, her bills and cash flow, her purchase of various vehicles, her complaints about how her driveway was repaired, even the food and restaurants she enjoyed. In discussing these matters, respondent believed that he was serving his client as the "deep rudder" that she seemed to need.

{¶ 29} Relator forcefully disputes respondent's asserted motivation. Relator claims that respondent's inability to properly justify his fees by an itemized invoice is suspicious, the rationale for his changing from an hourly fee to an annual retainer is questionable, and his pursuit of a designated heir was both. Relator argues that respondent's actions are all exacerbated by the vulnerability of his client and reveal a plan to take advantage of the financial resources to which respondent knew she had access. Relator insists that misconduct of this magnitude must be censured with at least the six-month actual suspension recommended by the board. See, e.g., *Cleveland Bar Assn. v. Kurtz* (1995), 72 Ohio St.3d 18, 647 N.E.2d 150 (six-month suspension with a monitored two-year probation and full restitution warranted by an attorney's excessive $17,000 fee, commingling, and failure to properly account for immigration clients' funds).

{¶ 30} We agree that an attorney may not serve in "a self-appointed role as a paraclete, comforter, helper, or hand holder, under the guise of legal services and at a lawyer's compensation rate." *Stanley v. Bd. of Professional Responsibility* (Tenn.1982), 640 S.W.2d 210, 213. This principle remains valid even though aspirational EC 7–8 acknowledges a lawyer's duty to assist his client in making informed decisions, a process that often implicates nonlegal considerations. To this end, a lawyer is to bring to bear "the fullness of his experience" and "objective viewpoint" in counseling a client about the possible effect of various legal alternatives, and the lawyer's advice "need not be confined to purely legal considerations." In fact, "it is often desirable for a lawyer to point out those factors which may lead to a decision that is morally just as well as legally permissible. He may emphasize the possibility of harsh consequences that might result from assertion of legally permissible positions." EC 7–8. Accord 2 Restatement of the Law 3d, Law Governing Lawyers (2000), Section 94(3) ("In counseling a client, a lawyer may address nonlegal aspects of a proposed course of conduct, including moral, reputational, economic, social, political, and business aspects").

{¶ 31} The decision to advise a client concerning nonlegal issues and accept compensation for that advice is not a bright-line test, but the propriety of this conduct may be assessed by applying the standard of a reasonable attorney in the

same situation. John M. Burman, *Advising Clients About Non–Legal Factors* (Feb.2004), 27 Wyoming Lawyer 40. Unquestionably, respondent did not act as a reasonable probate and business lawyer in basically befriending his unsophisticated client and charging for his "attorney's time" to do it. He admits in hindsight that he should have terminated their retainer agreement for his client's welfare.

{¶ 32} But as a sanction for his excessive fee, conflict of interest, and failure to account to his client, the panel recommended only a stayed one-year suspension of respondent's license, to be conditioned on repayment of almost half of the fees respondent charged. Moreover, the panel did not find a violation of DR 7–101(A)(3) (prohibiting an attorney from intentionally damaging or prejudicing a client during their professional relationship), as alleged in relator's complaint. We take from this recommendation that the panel credited respondent's claim that his misconduct was all the result of a grave but well-intentioned mistake.

{¶ 33} Unless the record weighs heavily against its findings, we defer to the credibility determinations of a hearing panel, inasmuch as they witnessed the testimony firsthand. *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. And here, we are convinced that the panel's view was justified. Having read the record and heard argument in this case, we accept the descriptions of respondent's practice as following in the "old-fashioned" traditions of dedication and caring for clients. With respect to this one client, however, respondent lost his perspective and tried to be more in their professional relationship than he could or should be for her. He attempted to charge for his counsel in the manner that a therapist might, overlooking that an attorney, unless a qualified therapist, may no more engage in that profession than a therapist may practice law without a license. See Burman, supra, 27 Wyoming Lawyer 40 ("The obligation to advise a client about non-legal factors does not give the lawyer, of course, a license to engage in activities which are the province of another profession").

{¶ 34} For these reasons, we adopt the sanction recommended by the panel, albeit with a slight modification, for respondent's violations of DR 2–106(A), 5–101(A)(1), and 9–102(B)(3). Respondent is therefore suspended from the practice of law in Ohio for one year; however, this suspension is stayed on the condition that respondent pay $30,000 in restitution in full to his aggrieved client within six months from the date of our order, along with interest at the judgment rate. See *Kurtz*, 72 Ohio St.3d at 21, 647 N.E.2d 150. If respondent fails to comply with this condition, the stay will be lifted, and respondent shall serve the entire one-year suspension. Costs are taxed to respondent.

Judgment accordingly.

Moyer, C.J., Resnick, F.E. Sweeney, Pfeifer, Lundberg Stratton, O'Connor and O'Donnell, JJ., concur.

Vorys, Sater, Seymour & Pease, L.L.P., and W. Breck Weigel, for relator.

White, Getgey & Meyer Co., L.P.A., and Ronald A. Meyer, for respondent.