**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Harmon,* **Slip Opinion No. 2019-Ohio-4171.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-4171

DISCIPLINARY COUNSEL *v.* HARMON.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Harmon,* Slip Opinion No. 2019-Ohio-4171.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct— Conditionally stayed two-year suspension and monitored probation.*

(No. 2018-0817—Submitted January 9, 2019—Decided October 15, 2019.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2017-036.

_____

**Per Curiam.**

{¶ 1} Respondent, Phillip Louis Harmon, of Worthington, Ohio, Attorney Registration No. 0033371, was admitted to the practice of law in Ohio in 1980.[1]

{¶ 2} In a complaint certified to the Board of Professional Conduct on August 8, 2017, relator, disciplinary counsel, charged Harmon with professional misconduct arising from his representation of a single client in several legal matters,

_____

1. Harmon is also admitted to practice law in the District of Columbia.

including his service as the client's attorney-in-fact pursuant to two powers of attorney.

{¶ 3} The parties entered into extensive factual stipulations and submitted hundreds of exhibits along with the testimony of seven witnesses, including Harmon. During his disciplinary hearing, Harmon admitted that he had committed each of the alleged rule violations. On that evidence, the panel found that Harmon committed all of the charged misconduct, and it recommended that he be suspended from the practice of law for two years with the final 18 months stayed on conditions. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction.

{¶ 4} Despite having stipulated to many of the board's factual findings and having admitted to the charged misconduct, Harmon objects to the board's findings of fact and misconduct, arguing that they are not supported by clear and convincing evidence, that the board failed to afford sufficient weight to his evidence, and that the charges against him should therefore be dismissed. In addition, he argues that he has been prejudiced by evidentiary rulings and procedural flaws in the proceedings below. For the reasons that follow, we overrule each of Harmon's objections and adopt the board's findings of fact and misconduct. Having independently weighed the aggravating and mitigating factors found by the board, however, we find that the appropriate sanction for Harmon's misconduct is a two-year suspension, stayed in its entirety on the condition that he engage in no further misconduct, combined with a term of monitored probation.

### The Board's Findings of Fact and Misconduct

{¶ 5} The conduct at issue in this case arose from Harmon's personal friendship with and legal representation of Donald Harper. Donald, a 1956 Olympic Silver Medalist, had been Harmon's high-school diving coach, and Harmon had known him and his wife, Sandra, for more than 40 years when he drafted their estate plan in 2011.

{¶ 6} By 2015, Donald had been diagnosed with dementia and was living in a facility that specialized in caring for people with dementia. When the Harpers told Harmon that they wanted to end their marriage, he advised them that he would not be able to represent either of them in an adversarial proceeding because doing so would place him in a conflict-of-interest situation. Harmon and Sandra discussed the possibility of his representing Donald, so long as the termination of the marriage remained nonadversarial, and shortly thereafter, Sandra retained her own attorney. Although Harmon was aware that Sandra was represented by counsel, he communicated with her directly on several occasions from mid-November 2015 through late January 2016.

{¶ 7} In early November 2015, while away from the residential care facility on a supervised home visit, Donald drove away in the family car without telling anyone where he was going. He drove to his daughter Anne Halliday's home in Colorado and then back to Ohio, but he refused to return to the residential care facility. Instead, he returned to the marital residence, where Sandra was still living, for a few days. On November 13, 2015, the police were called to the residence, and Donald was arrested and charged with domestic violence and assault following an altercation with Sandra.

{¶ 8} On November 14, Harmon entered an appearance as counsel in Donald's criminal case and Donald was released on bond. He later helped Donald move into an extended-stay hotel.

{¶ 9} On November 19, 2015, Harmon drafted and Donald signed a general and durable power of attorney that revoked a previously executed power of attorney, named Harmon as Donald's attorney-in-fact, and named Halliday as his successor attorney-in-fact. The newly executed power of attorney bore an expiration date of February 28, 2016.

{¶ 10} On December 8, Donald signed a third power of attorney, identical to the November 19 power of attorney, except that it specified that it was for an

unlimited period of time and it expressly revoked the November 19 power of attorney. Harmon then accompanied Donald to a bank, where Donald opened a new credit-card account and took a $5,000 cash advance. Donald deposited the money into his checking account and issued a $2,500 check to Harmon as partial payment for legal services rendered in his criminal case. Two days later, Donald issued a $5,000 check to Harmon. Although the memo line of the check stated that it was for "POA matters," Harmon actually used the money to pay for legal and nonlegal services that he had rendered on Donald's behalf—including visiting with Donald, taking him to the gym, and making sure that he took his medications—all of which Harmon billed at the rate of $200 an hour.

{¶ 11} In mid-December, Harmon sent Halliday an e-mail asking her to immediately assume custody of and take care of her father. Halliday replied that she was willing to find a permanent living arrangement for her father in Colorado or Ohio. In response, Harmon informed Halliday that he preferred that Donald live in Colorado and asked her to assume custody no later than January 31, 2016. Harmon continued to confer directly with Halliday regarding Donald's living situation into January 2016, even though he knew that Halliday was represented by counsel.

{¶ 12} On January 5, 2016, Donald entered a plea to an amended charge of disorderly conduct/intoxication. He was sentenced to two years of community control and ordered to pay a fine of $100 and to stay away from Sandra and the marital home. As a condition of his community control, Donald was required to obtain permission from his probation officer before leaving Franklin County for more than 72 hours.

{¶ 13} Several days after Donald entered his plea, Harmon e-mailed Sandra's attorney a proposal to dissolve the Harpers' marriage and suggested that the marital assets be divided equally. Harmon requested a $50,000 advance against Donald's share to pay his bill of approximately $18,000 for services rendered plus

a $10,000 retainer for future services, with the remainder allocated to pay Donald's credit-card bill and future living expenses. On January 22, Harmon informed Sandra's attorney that he intended to file a complaint for divorce on Monday, January 25.

{¶ 14} But when Harmon went to Donald's hotel room on Friday, January 22, he found only Donald's friend Edward Bruno. Bruno, who had taken Donald to the airport to catch a flight to Colorado, denied knowing where Donald was. Harmon filed a missing-person report with local police and sent an e-mail to Sandra's attorney detailing his efforts to locate Donald.

{¶ 15} At 7:49 p.m. that evening, Halliday sent an e-mail to all concerned stating that Donald had arrived safely in Colorado, that he intended to reside there, and that she would personally see to any medical or personal care that he needed. Shortly thereafter, Halliday's husband left Harmon a voicemail message stating that Donald was safe. But at 8:19 p.m., Harmon sent an e-mail to all concerned stating that Donald was "not 'safe,' medically or legally," because the terms of his probation prohibited him from leaving the state and he had important medical appointments scheduled in Ohio. He also advised that anyone who had knowingly assisted Donald in violating his probation would be subject to criminal prosecution.

{¶ 16} Ensuing communications demonstrate that Harmon believed that Donald's departure from the state had been involuntary or the product of undue influence and that Harmon refused to believe that Donald was safe. But at 3:13 p.m. on January 23, Halliday sent him an e-mail with an attached letter, signed by Donald and herself, stating that Donald had left Ohio of his own free will and that he no longer wanted Harmon to represent him. New counsel for Donald quickly intervened to modify the terms of Donald's probation, thereby eliminating the threat of sanctions for his departure from Franklin County.

{¶ 17} Despite having received notice that Donald no longer wanted Harmon to represent him, Harmon continued to e-mail Sandra's attorney seeking a

"global settlement" that would require (1) all concerned parties and their attorneys to sign a confidential mutual settlement-and-release agreement, releasing all claims against all parties and all attorneys, (2) payment of all attorney fees owed to the attorneys for the parties, including Harmon's fees, which exceeded $25,000, and (3) the return of Donald's Olympic ring, which Harmon claimed to hold as collateral for payment of his fees.

{¶ 18} When that effort proved unsuccessful, Harmon filed a petition for declaratory judgment and other relief against Donald, Sandra, Halliday, Bruno, and the trustee of the Harper Family Trust Agreement in the Franklin County Probate Court. In that pleading, Harmon advised the court that he faced a conflict of interest that required judicial review and resolution and asked the court to construe Donald's December 8, 2015 power of attorney and the Harper Family Trust Agreement.

{¶ 19} Harmon's petition for declaratory judgment also stated civil claims for (1) tortious interference with a contractual fiduciary relationship, for which he sought an amount sufficient to compensate himself and Donald for the loss of the benefits of their contractual relationship, (2) undue influence, for which he sought an amount sufficient to compensate Donald for the loss of his share of the marital estate, and (3) an award of spousal support for Donald, including Harmon's legal fees and costs related to his role as Donald's attorney-in-fact. In addition, Harmon sought leave of court to withdraw from all representations and requested the appointment of a guardian ad litem and legal counsel to represent Donald in the proceedings. He later filed a notice in the probate court claiming that Halliday had engaged in the unauthorized practice of law by drafting letters and documents signed by her father, including a document revoking Harmon's power of attorney.

{¶ 20} Harmon voluntarily dismissed his petition for declaratory judgment at a March 28, 2016 status conference—but not before he falsely informed the magistrate that Donald had been "kidnapped" and that he had not received any

information regarding Donald's safety and welfare. The next day, Harmon asked Donald and Sandra to suggest a fair payment for the services he had rendered and another attorney submitted Sandra's grievance against Harmon to relator. Approximately one week later, Harmon revised his timesheets and voluntarily reduced his proposed legal fees from $9,350 to $8,684 for his work in the domestic-relations matter and from $20,954 to $7,438 for the services he had provided as Donald's attorney-in-fact. He also offered to consider further reduction of his fees upon request.

**{¶ 21}** At Harmon's disciplinary hearing, attorney Michael Murman testified as an expert witness on behalf of relator. He expressed his opinion that Harmon's petition for declaratory judgment "[w]as very irregular and evidence of really bad-faith, an attempt to complicate things, an acting out." He further opined that the filing of the suit was "completely inappropriate" as a tactic for Harmon to get his fees paid.

**{¶ 22}** Based on these findings, the board found that Harmon violated Prof.Cond.R. 1.5(a) (prohibiting a lawyer from making an agreement for, charging, or collecting an illegal or clearly excessive fee), 1.7(a)(2) (providing that a lawyer's continued representation of a client creates a conflict of interest if there is a substantial risk that the lawyer's ability to represent the client will be materially limited by the lawyer's responsibilities to another client, former client, or third person or by the lawyer's own personal interests), 1.16(a)(3) (requiring a lawyer to withdraw from representation if the lawyer is discharged), 3.1 (prohibiting a lawyer from bringing or defending a proceeding that is unsupported by law or lacks a good-faith argument for an extension, modification, or reversal of existing law), 3.3(a)(1) (prohibiting a lawyer from knowingly making a false statement of fact or law to a tribunal), 4.2 (prohibiting a lawyer from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or a

court order), and 4.4 (prohibiting a lawyer, while representing a client, from using means that have no substantial purpose other than to embarrass, harass, delay, or burden a third person).

**Harmon's Objections to the Board's Proceedings and Findings**

{¶ 23} In response to the board's report and recommendation, Harmon asserts four propositions of law, challenges the sufficiency of the evidence with respect to each of the seven ethical violations found by the board, and raises five objections related to alleged prejudice caused by relator's investigation and the panel's evidentiary and procedural rulings.

*Stipulations of Fact Can Constitute Clear and*

*Convincing Evidence of a Violation*

{¶ 24} In a disciplinary proceeding, the relator bears the burden of proving, by clear and convincing evidence, the facts necessary to establish a violation of a professional-conduct rule. *Disciplinary Counsel v. Squire*, 130 Ohio St.3d 368, 2011-Ohio-5578, 958 N.E.2d 914, ¶ 34; Gov.Bar R. V(12)(I).

{¶ 25} As his first proposition of law, Harmon asserts that "[a] stipulation in a disciplinary proceeding is not proof of a violation by clear and convincing evidence unless the stipulation is supported by sufficient evidence." With this proposition, Harmon suggests that stipulations of fact cannot constitute clear and convincing evidence that an attorney has committed an ethical violation unless those stipulations are also supported by clear and convincing evidence. *Black's Law Dictionary* 1641 (10th Ed.2014) defines "stipulation" as a "voluntary agreement between opposing parties concerning some relevant point; esp., an agreement relating to a proceeding, made by attorneys representing adverse parties to the proceeding." Thus, a stipulation is nothing more than an agreement as to the truth of a fact in issue. And this court has long recognized the rule that

parties "may waive certain rights which are given them in a court of justice; they may agree that certain facts exist, without other proof of their existence; a party may waive exception to evidence not technically legal, may waive informalities in adversary pleading, or may admit, generally, that the issue joined against him, and suffer judgment without an investigation of the facts."

*State v. Tate*, 138 Ohio St.3d 139, 2014-Ohio-44, 4 N.E.3d 1016, ¶ 19, quoting *Gittings v. Baker*, 2 Ohio St. 21, 23-24 (1853). Thus, contrary to Harmon's proposition of law, stipulations of fact *can* constitute clear and convincing evidence of a rule violation.

{¶ 26} However, the board's prehearing instructions plainly state, "Parties should bear in mind that *stipulations of rule violations* must be supported by clear and convincing evidence of each alleged rule violation. The hearing panel is not bound to accept stipulated rule violations that are not supported by stipulated facts and exhibits or evidence presented at the hearing." (Emphasis added.) Ohio Board of Professional Conduct, Prehearing Instructions, https://docs.wixstatic.com/ugd/b9a93d_6cb1cc01f5df45ac9f5ae4d0a7d69474.pdf (accessed June 12, 2019). In other words, there must be sufficient facts to support each element of a rule violation, and when the parties have not stipulated to all the facts necessary to prove an alleged rule violation, it is incumbent upon the relator to establish the remaining elements of the offense by clear and convincing evidence.

{¶ 27} Relator could have submitted this case to the board on the parties' stipulated facts if he believed that those facts were sufficient to prove his case. In this instance, however, relator elected to present additional evidence—the testimony of seven witnesses, including Harmon, and over 160 exhibits—all of

which were considered by the board and this court in determining whether relator has proved his case by clear and convincing evidence.

*Mitigation Evidence Is Evidence that*

*May Weigh in Favor of a Less Severe Sanction*

{¶ 28} As his second proposition of law, Harmon asserts that "[m]itigation evidence that contradicts a stipulation in a disciplinary proceeding is permitted if a party seeks and is granted leave to present additional evidence to contradict the stipulation." Here, however, Harmon did not seek to withdraw his stipulations or obtain leave to present additional evidence regarding his conduct. Rather, he stated at his disciplinary hearing that he stipulated to all seven alleged violations and that he would like to have an opportunity to "present some mitigation evidence," to which the panel chair replied, "Certainly." And pursuant to Gov.Bar R. V(13)(C), mitigation evidence consists of evidence that may weigh in favor of a less severe sanction—not evidence that purports to contradict the very stipulations of fact and misconduct that the respondent freely and voluntarily entered into. We therefore conclude that the panel chair did not grant Harmon leave to withdraw his stipulations of fact and misconduct or to present evidence that contradicted those stipulations but permitted him to present evidence that might weigh in favor of a less severe sanction.

*The Board Has No Obligation to Provide More Detailed Findings of Fact*

{¶ 29} As his third proposition of law, Harmon asserts that "[i]f a grievant in a disciplinary proceeding requests findings of fact and conclusions of law on each charge, the Board of Professional Conduct must identify the specific facts and legal authority on each separate charge which supports its recommended sanction." And as his fifth objection to the board's report, Harmon argues that he was prejudiced by the board's failure to identify the elements of each offense and to articulate the specific facts that prove each of those elements. Harmon does not offer any support for these arguments or even suggest how the board's alleged

10

failure prejudiced his case. Moreover, nothing in the rules requires the board to provide the level of specificity that Harmon demands. On the contrary, Gov.Bar R. V(12)(K) provides:

> If the Board determines that a public reprimand, suspension for a period for a period of six months to two years, probation, suspension for an indefinite period, or disbarment is merited, the Board shall file a certified report of its proceedings, including its findings of fact, conclusions of law, and recommended sanction, with the clerk of the Supreme Court.

{¶ 30} We find that the board's 15-page report conforms to the requirements of the rule and provides ample information both to Harmon and to this court, allowing us to effectively evaluate Harmon's conduct. Consequently, we overrule Harmon's arguments in this regard.

*Harmon's Declaratory-Judgment Action Was Not Necessary or Reasonably Calculated to Protect His Client*

{¶ 31} As his fourth proposition of law, Harmon asserts that it is not a violation of the Rules of Professional Conduct for an attorney and fiduciary to report perceived financial injury of an impaired client by filing a civil action in the probate court under R.C. 1337.36 (permitting certain interested persons to petition a court to construe a power of attorney or review the agent's conduct and grant appropriate relief). He cites *Dayton Bar Assn. v. Parisi*, 131 Ohio St.3d 345, 2012-Ohio-879, 965 N.E.2d 268, for the proposition that his declaratory-judgment action was *necessary* to effectuate his withdrawal from Donald's representation, to protect Donald going forward, and to collect his fee. Consequently, Harmon contends that the board's findings that he violated Prof.Cond.R. 1.16(a)(3), 3.1, and 4.4 are not supported by clear and convincing evidence.

**{¶ 32}** While we agree with the general principle that an attorney does not violate the Rules of Professional Conduct by reporting the perceived financial injury of an impaired client to a probate court, we find that Harmon's declaratory-judgment action was neither required by *Parisi* nor reasonably calculated to protect Donald's interests.

**{¶ 33}** In *Parisi*, we found that an attorney had engaged in conduct that was prejudicial to the administration of justice by obtaining a power of attorney over her client's affairs *after* she had filed an application for guardianship alleging that the client was incompetent and then using that power of attorney to pay herself nearly $19,000 for her legal services without obtaining the probate court's approval. *Parisi* at ¶ 7. Harmon, in contrast, served as Donald's agent and attorney-in-fact pursuant to a power of attorney that required no court approval for his termination, withdrawal from the representation, or payment of his reasonable fees. *See*, *e.g.*, R.C. 1337.30(B)(1) (providing that an agent's authority terminates when the principal revokes the authority); R.C. 1337.38 (permitting an agent to resign by giving notice to the principal and if the principal is incapacitated, to the principal's caregiver, another person reasonably believed by the agent to have sufficient interest in the principal's welfare, or a governmental agency having authority to protect the welfare of the principal); R.C. 1337.32 (providing that unless the power of attorney provides otherwise, an agent is entitled to compensation that is reasonable under the circumstances).

**{¶ 34}** And here, there is ample evidence that Harmon's declaratory-judgment action was not reasonably calculated to protect his client from his family's alleged neglect, abuse, and undue influence as Harmon claimed. Indeed, Harmon waited nearly four weeks after Donald's purported kidnapping to file the action. And rather than seek guardianship or limited guardianship under R.C. 2111.03 to ensure Donald's long-term physical and financial well-being, Harmon sought only to have a guardian ad litem appointed to protect Donald's interests in

the declaratory-judgment action. Furthermore, there was no need to construe Harmon's authority under the power of attorney given that Donald had already terminated Harmon's authority to act as his attorney in fact and at law and Halliday had done exactly as Harmon had asked by relocating her father to Colorado before January 31, 2016, and taking care of his affairs as his successor attorney-in-fact. Despite Harmon's arguments and evidence to the contrary, the board found and we agree that the primary purposes of Harmon's declaratory-judgment action were to collect his fees and to harass and embarrass Halliday and Bruno for interfering in his relationship with Donald. Because the record does not weigh heavily against those findings, we defer to the credibility determinations of the panel members who were able to see and hear the witnesses firsthand. *See, e.g.*, *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. We therefore overrule Harmon's objections in this regard and adopt the board's findings of fact and misconduct with respect to Harmon's violations of Prof.Cond.R. 1.16(a)(3), 3.1, and 4.4.

*The Board's Remaining Findings of Fact and Misconduct*
*Are Supported by Clear and Convincing Evidence*

{¶ 35} Next, Harmon challenges the board's findings that he charged a clearly excessive fee, had a conflict of interest that should have prevented him from representing Donald in the termination of his marriage, had improper communication with a represented party, and made false statements to the probate magistrate, in violation of Prof.Cond.R. 1.5(a), 1.7(a)(2), 4.2, and 3.3(a). He argues that the fee he charged for Donald's legal and nonlegal matters was a technical rather than a substantive violation of the professional-conduct rules, noting that he could reasonably have charged a higher rate for his legal services and ultimately had agreed to lower the hourly rate he charged for his nonlegal services. But Harmon's arguments do not diminish the fact that he has admitted that he charged the same hourly rate for legal and nonlegal services—a practice that we have

previously denounced as violating the rule against charging a clearly excessive fee. *See, e.g.*, *Erie-Huron Cty. Bar Assn. v. Zelvy,* 155 Ohio St.3d 609, 2018-Ohio-5095, 122 N.E.3d 1267. His arguments that the parties orally consented to his representing Donald in the termination of his marriage and agreed to engage in a collaborative family-law process that would permit him to have direct communication with Sandra are likewise without merit as he has presented no evidence that either Sandra or Donald gave written consent to either the representation despite the conflict of interest as required by Prof.Cond.R. 1.7(b) or the collaborative family-law process as required by R.C. 3105.44(A). And despite Harmon's assertion that the board found only that he had *misled* the probate-court magistrate, we note that the board expressly found that Harmon had knowingly made false statements of fact or law to a tribunal by advising the magistrate that Donald had been kidnapped and that he had not received any information regarding Donald's safety and welfare. We therefore overrule Harmon's objections in this regard and adopt the board's findings of fact and misconduct with respect to Prof.Cond.R. 1.5(a), 1.7(a)(2), 4.2, and 3.3(a).

*Harmon's Procedural Objections Are Without Merit*

**{¶ 36}** As his four remaining objections, Harmon argues that he was prejudiced by (1) relator's failure to complete his investigation within one year of Sandra's filing a grievance against him, (2) relator's failure to interview Donald or Sandra during the course of this disciplinary proceeding, (3) the panel chair's denial of his motion to depose relator regarding his alleged collusion with former disciplinary counsel to initiate an unwarranted investigation against Harmon,[2] and (4) the panel chair's exclusion of certain exhibits that Harmon sought to admit in an effort to prove that others involved in the underlying litigation had engaged in

---

2. Harmon has moved to strike relator's answer to this objection and to impose sanctions on relator based on relator's alleged inclusion of facts that are not part of the record in this case. Because Harmon failed to object to those facts, which were stated in no fewer than four of relator's previous filings beginning in September 2017, we overrule his motion to strike and for sanctions.

misconduct. Having thoroughly reviewed Harmon's arguments and the record, however, we find that these objections are without merit.

### Recommended Sanction

**{¶ 37}** When imposing sanctions for attorney misconduct, we consider all the relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

**{¶ 38}** As aggravating factors, the board found that Harmon had acted with a dishonest or selfish motive; had committed multiple offenses; and had failed to make restitution for the legal fees that Halliday, Sandra, and Bruno incurred as a result of his misconduct. *See* Gov.Bar R. V(13)(B)(2), (4), and (9). In addition, the board found that despite his extensive factual stipulations and his eventual admission that he had committed the charged violations, Harmon had failed to fully acknowledge the wrongful nature of his misconduct. *See* Gov.Bar R. V(13)(B)(7). In mitigation, the board found that Harmon had no prior discipline and had submitted a number of letters attesting to his good character. *See* Gov.Bar R. V(13)(C)(1) and (5).

**{¶ 39}** Finding that there are no Ohio disciplinary cases involving the exact combination of rule violations found in this case, the board considered the sanctions we have imposed in cases involving just some of those violations. For example, in *Disciplinary Counsel v. Maniscalco*, 68 Ohio St.3d 483, 628 N.E.2d 1357 (1994), we publicly reprimanded an attorney who had filed two frivolous lawsuits. In *Disciplinary Counsel v. Schuman*, 152 Ohio St.3d 47, 2017-Ohio-8800, 92 N.E.3d 850, we imposed a one-year suspension with six months stayed on conditions on an attorney who had collected a clearly excessive fee and had knowingly made a false statement of fact or law to a tribunal. And in *Cincinnati Bar Assn. v. Alsfelder*, 103 Ohio St.3d 375, 2004-Ohio-5216, 816 N.E.2d 218, we imposed a conditionally stayed one-year suspension stayed on condition on an attorney who had failed to

obtain his client's informed consent to a conflict of interest, had charged legal rates for nonlegal services, and had failed to maintain complete records of client property coming into his possession. Recognizing that Harmon's conduct was more extensive than the misconduct committed by Maniscalo, Schuman, and Alsfelder, the board believed that a greater sanction was warranted. The board cited *Cincinnati Bar Assn. v. Lukey*, 110 Ohio St.3d 128, 2006-Ohio-3822, 851 N.E.2d 493, ¶ 23, for the proposition that "[a]n actual suspension of a lawyer's license to practice is the appropriate sanction when the lawyer has intentionally misrepresented a crucial fact to a court in order to benefit a party" and recommended that Harmon be suspended for two years with 18 months stayed on the conditions that he engage in no further misconduct and make full restitution to Halliday, Sandra, and Bruno.

{¶ 40} Having sought a general dismissal of relator's complaint, Harmon has not specifically objected to the board's recommended sanction. He notes, however, that this is his first disciplinary offense after almost 40 years of practice, that he fully cooperated with relator's investigation, and that he entered into extensive stipulations of fact in this matter. He also suggests that his false statements to the probate-court magistrate "were an overstatement in the midst of an emotional legal argument." At the panel hearing, Harmon stated that he had previously never served under a power of attorney or as a guardian, and it is evident from his testimony that his emotional involvement and his desire to protect his friend and mentor of more than 40 years clouded his judgment in this case. We also note that Harmon has submitted more than 30 letters from attorneys, former clients, and friends attesting to his good character, reputation, and legal skill. On these facts, we believe that a two-year suspension, all stayed on the condition that Harmon engage in no further misconduct, combined with a two-year period of monitored probation will adequately protect the public from future harm.

**{¶ 41}** The board has also recommended that Harmon be required to make restitution of $12,961 to Halliday, $38,675.25 to Sandra, and $1,000 to Bruno to compensate them for the attorney fees they incurred in defending his declaratory-judgment action. Although we have ordered a respondent to reimburse a client for the additional attorney fees the client incurred by hiring another attorney to perform the work the respondent had failed to complete, *see Toledo Bar Assn. v. Harvey*, 141 Ohio St.3d 346, 2014-Ohio-3675, 24 N.E.3d 1106, ¶ 30, 37, *superseded in part on other grounds by rule as stated in Cincinnati Bar Assn. v. Fernandez,* 147 Ohio St.3d 329, 2016-Ohio-5586, 65 N.E.3d 724*,* relator has cited no case in which we have ordered a respondent to make restitution to a third party for attorney fees allegedly occasioned by the respondent's misconduct. Because Halliday, Sandra, and Bruno had the opportunity to seek an award of attorney fees pursuant to Civ.R. 11, we decline to award those fees as restitution in this case.

**{¶ 42}** Accordingly, Phillip Louis Harmon is suspended from the practice of law in Ohio for two years, with the entire suspension stayed on the condition that he engage in no further misconduct. Harmon shall also serve a two-year period of monitored probation in accordance with Gov.Bar R. V(21). If Harmon fails to comply with the condition of the stay, the stay will be lifted and he shall serve the full two-year suspension. Costs are taxed to Harmon.

Judgment accordingly.

O'CONNOR, C.J., and FRENCH and DONNELLY, JJ., concur.

DEWINE, J., concurs in judgment only.

KENNEDY, J., dissents, with an opinion joined by STEWART, J.

FISCHER, J., dissents, with an opinion.

STEWART, J., dissents and would order restitution to the third parties.

_____

**KENNEDY, J., dissenting.**

{¶ 43} Today the majority imposes on respondent, Phillip Louis Harmon, a two-year suspension, all stayed, and a term of monitored probation for a wide array of professional misconduct. Because our precedent, together with the aggravating factors and minimal mitigating factors in this case, requires the imposition of a term of actual suspension, I dissent. I would adopt the recommendation of the Board of Professional Conduct regarding the suspension and impose a two-year suspension with 18 months stayed on the condition that Harmon engage in no further misconduct. I would not order probation in this case. Further, I note that the majority fails to include any conditions of probation, which this court must include as part of imposing a term of monitored probation, *see Disciplinary Counsel v. Halligan*, ___ Ohio St.3d ___, 2019-Ohio-3748, ___ N.E.3d ___, ¶ 39-45 (Kennedy, J., concurring in part and dissenting in part).

{¶ 44} Harmon committed multiple violations of the Rules of Professional Conduct in his representation of Donald Harper, including charging clearly excessive fees (Prof.Cond.R. 1.5(a)), making a false statement to a tribunal (Prof.Cond.R. 3.3(a)(1)), failing to obtain written consent to represent a party despite a conflict of interest (Prof.Cond.R. 1.7(a)(2)), and bringing an action unsupported by law for the purpose of collecting his fees and harassing and embarrassing Donald's daughter, Anne Halliday, and Donald's friend, Edward Bruno (Prof.Cond.R. 4.4).

{¶ 45} As aggravating factors, the board found and the justices joining the lead opinion agreed that Harmon acted with a dishonest or selfish motive, committed multiple offenses, and failed to fully acknowledge the wrongful nature of his misconduct. *See* Gov.Bar R. V(13)(B)(2), (4), and (7). I agree with these findings, but based on a review of the record, I would also find as an aggravating factor that Harmon's misconduct caused harm to a vulnerable person, *see* Gov.Bar

R. V(13)(B)(8), on the basis that Harmon's misconduct involved a victim who had been diagnosed with dementia.

**{¶ 46}** While I fully acknowledge as mitigating that this is Harmon's first disciplinary offense in a long career in the practice of law and that more than 30 letters attesting to his good character, reputation, and legal skill were submitted, I disagree with the lead opinion's determination that Harmon's judgment was "clouded" by "his desire to protect his friend and mentor," lead opinion at ¶ 40, and I reject the idea that Harmon's testimony that he had never previously served as an agent under a power of attorney or as a guardian merits consideration as mitigating.

**{¶ 47}** I agree that Harmon's judgment was clouded, but I do not agree that it was clouded by a desire to protect his friend. His actions belie the notion that he had Donald's best interests at heart and instead demonstrate an overriding desire to collect his fees. Who protects a friend suffering from dementia by doing the following: accompanying him to a bank and having him open a new credit-card account in order to secure a $5,000 cash advance and then taking $2,500 of those funds; charging a legal rate for nonlegal services such as visiting him, driving him to the gym, and making sure he took his medication; or holding his 1956 Olympic ring as collateral until his attorney fees are paid? From obtaining the original power of attorney to seeking a $50,000 advance from Donald's share of a proposed divorce settlement to the filing of the action in probate court, Harmon's actions demonstrated the relentless pursuit of fees.

**{¶ 48}** As for Harmon's claim to never having served as an agent under a power of attorney or as a guardian constituting some mitigating evidence, one of the foundational aspects of the Rules of Professional Conduct is that a lawyer should assume representation of a client only in those matters that the lawyer is competent to undertake. Prof.Cond.R. 1.1. If Harmon's legal experience was such that he could not competently represent Donald under a power of attorney or as a guardian, then he should have declined to undertake the representation.

**{¶ 49}** I agree with the lead opinion's determination that there is no Ohio disciplinary case involving the combination of rule violations at issue here; the board nevertheless examined three separate cases involving some of the rule violations at issue here, and those cases, together with the aggravating factors and minimal mitigating factors in this case, support the imposition of an actual term of suspension.

**{¶ 50}** In *Disciplinary Counsel v. Schuman*, 152 Ohio St.3d 47, 2017-Ohio-8800, 92 N.E.3d 850, an attorney who had served as a court-appointed guardian ad litem in a child-custody case filed an action against the parents in municipal court to recover attorney fees charging a legal-services rate of $150 an hour despite the fact that the juvenile court had approved a rate of $80 an hour. Schuman then moved for a default judgment after the parents failed to answer the complaint. Attached to the motion for default judgment was an affidavit indicating that $150 an hour was a reasonable rate and an itemized bill that had been submitted and filed with the juvenile court. Schuman had altered the itemized bill by changing the $80-an-hour court-approved rate and the total fees due. The aggravating factors in that case were a selfish motive, multiple offenses, and harm to a vulnerable person. The mitigating factors were no prior disciplinary record, a cooperative attitude and full and free disclosures to the board, and 55 letters attesting to Schuman's good character. We suspended Schuman from the practice of law in Ohio for one year, with the final six months stayed on the conditions that he commit no further misconduct and complete two continuing-legal-education courses on law-office management.

**{¶ 51}** Here, Harmon's misleading of the tribunal did not involve falsifying documents, but he knowingly made false statements to a magistrate in an action unsupported by law that he had filed in an effort to collect his own fees. Moreover, Harmon violated additional professional-conduct rules that Schuman did not violate.

**{¶ 52}** In *Disciplinary Counsel v. Maniscalco*, 68 Ohio St.3d 483, 628 N.E.2d 1357 (1994), this court adopted the parties' stipulated sanction and publicly reprimanded an attorney who had filed two frivolous lawsuits. In that case, no aggravating factors were found and the parties stipulated to mitigating factors of no prior misconduct, cooperation with the investigation, and full and free disclosure to the board. But unlike in this case, Maniscalco's clients were willing participants in the filing of the frivolous lawsuits. Here, Harmon had no client prompting him to file suit; he did so to benefit himself. And Harmon committed significant violations that were not at issue in *Maniscalco*.

**{¶ 53}** In *Cincinnati Bar Assn. v. Alsfelder*, 103 Ohio St.3d 375, 2004-Ohio-5216, 816 N.E.2d 218, we adopted the panel's recommended sanction, with a slight modification, instead of the board's recommended sanction. The panel recommended a stayed one-year suspension for Alsfelder's failing to obtain informed consent from a client regarding a conflict of interest, billing for nonlegal services at a legal rate, and failing to maintain complete records of all client funds that came into his possession and render appropriate accounts regarding those funds. The board recommended a one-year suspension with only the last six months stayed. The case centered on Alsfelder's charging a client an exorbitant flat annual rate for legal services even though the time he spent with the client often involved nonlegal services; it seemed the client did not require sophisticated legal counsel but instead craved attention. The panel recommended the stay be "conditioned on repayment of almost half of the fees," *id*. at ¶ 32, while we required the payment of restitution in full within six months of the date of the order. In reaching our decision, we noted that the panel had not found a violation of the attorney-conduct rule prohibiting an attorney from intentionally damaging or prejudicing a client during their professional relationship. We took from the panel's recommendation that "the panel credited [Alsfelder's] claim that his misconduct was all the result of a grave but well-intentioned mistake." *Id*.

**{¶ 54}** In contrast, there was nothing well-intentioned about Harmon's behavior in this case. As the lead opinion recognizes, the filing of the declaratory-judgment action was calculated to collect fees—including legal fees knowingly charged for nonlegal work—and to harass and embarrass people close to Donald. Harmon knew he had a conflict of interest that prevented him from ethically representing either party in the divorce case, but he continued to represent Donald, and he repeatedly contacted Sandra Harper even though she was represented by other counsel. He misled the magistrate in the probate case by indicating that he did not know Donald's whereabouts.

**{¶ 55}** I would hold that this case is more akin to *Schuman* and requires a similar actual suspension. "[W]hen an attorney's misconduct involves repeated dishonesty—and especially when the dishonesty includes making misrepresentations to a court—an actual suspension from the practice of law is warranted." *Schuman*, 152 Ohio St.3d 47, 2017-Ohio-8800, 92 N.E.3d 850, at ¶ 14.

**{¶ 56}** "[T]he primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public." *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. "Protecting the public, however, is not strictly limited to protecting clients from a specific attorney's potential misconduct. Imposing attorney-discipline sanctions also protects the public by demonstrating to the bar and the public that this type of conduct will not be tolerated." *Schuman* at ¶ 17. And we should demonstrate through our sanction in this case that behavior such as Harmon's will not be tolerated:

> A lawyer who engages in a material misrepresentation to a court or
> a pattern of dishonesty with a client violates, at a minimum, the
> lawyer's oath of office * * *. Such conduct strikes at the very core
> of a lawyer's relationship with the court and with the client. Respect
> for our procession is diminished with every deceitful act of a lawyer.

> We cannot expect citizens to trust that lawyers are honest if we have
> not yet sanctioned those who are not.

*Disciplinary Counsel v. Fowerbaugh*, 74 Ohio St.3d 187, 190, 658 N.E.2d 237 (1995).

{¶ 57} For all the foregoing reasons, I would impose a two-year suspension with the final 18 months stayed on the condition of no further misconduct. I would not impose probation on Harmon; he has practiced law for nearly 40 years without any other involvement in the disciplinary process, and his behavior here seems the result of human frailties—avarice and emotion—rather than a result of ongoing professional shortcomings. If he engages in further misconduct, the stay on his two-year suspension will be lifted. But because the majority does impose probation, it should impose conditions on that probation. *See Halligan*, ___ Ohio St.3d ___, 2019-Ohio-3748, ___ N.E.3d ___, at ¶ 39-45 (Kennedy, J., concurring in part and dissenting in part) (explaining that when this court imposes probation, it must also impose conditions for the probation). I agree with the other dissenting opinion that this court should not overburden attorneys who contribute their time to volunteer as probation monitors. Therefore, probation should be meted out judiciously rather than reflexively and this court should set forth the conditions of the probation, providing clear guidance for both the monitor and the respondent. After all, the first duty listed for monitors in Gov.Bar R. V(21)(B)(1) is to "[m]onitor compliance by the respondent with the conditions of probation imposed by the Supreme Court." Specific conditions provide parameters and predictability for monitors; in contrast, a broad mandate to monitor creates uncertainty as to the breadth and depth of the monitor's responsibility. The work of an attorney is often fast-paced and complex; every day brings new challenges related to achieving the goals of clients. Monitors should be given a framework in which to skillfully examine certain aspects of a respondent's practice, rather than be forced to attempt

23

an all-encompassing, untargeted supervision of the practice. Defining the duties for a monitor—by way of establishing expectations for a respondent—makes the monitoring more manageable, not overtaxing. It's also what the Rules for the Government of the Bar require.

STEWART, J., concurs in the foregoing opinion.

_____

**FISCHER, J., dissenting.**

{¶ 58} Like the other dissenting opinion, I too would impose a two-year suspension with 18 months stayed on the condition that respondent, Philip Louis Harmon, engage in no further misconduct.

{¶ 59} I disagree with the other dissenting opinion, however, to the limited extent that it calls for specific conditions in each and every case in which monitored probation is imposed as a sanction.

{¶ 60} As I have previously observed, *see Disciplinary Counsel v. Halligan*, ___ Ohio St.3d ___, 2019-Ohio-3748, ___ N.E.3d ___, ¶ 33-37 (Fischer, J., concurring), no rule in the Rules for the Government of the Bar mandates that this court specify conditions during a probation period. In fact, as each disciplinary case is unique, the rules are written to give the Board of Professional Conduct the flexibility to recommend any conditions, and for the court to order conditions, if any, as may be desirable given the specific facts and circumstances involved. *Id.*

{¶ 61} Additionally, as a practical matter, reading such an intense requirement into the rules poses certain problems. This court relies a great deal upon volunteers to help administer Ohio's attorney-discipline system. This includes the attorneys who volunteer to serve as probation monitors. If the court were to impose numerous specific conditions in monitored-probation cases, it would tax those attorneys, who are already so generous with the time they spend volunteering as monitors, by asking even more of them.

{¶ 62} Therefore, I respectfully and separately dissent.

_____

Scott J. Drexel, Disciplinary Counsel, Joseph M. Caligiuri, Chief Assistant Disciplinary Counsel, and Karen H. Osmond, Assistant Disciplinary Counsel, for relator.

Phillip L. Harmon, pro se.

_____