[Cite as *Desai v. CareSource, Inc.*, 2024-Ohio-3028.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

NEHA DESAI et al.                       :
                                        :
        Appellants                      :   C.A. No. 29965
                                        :
v.                                      :   Trial Court Case No. 2018 CV 01133
                                        :
CARESOURCE INC et al.                   :   (Civil Appeal from Common Pleas
                                        :   Court)
        Appellees                       :
                                        :

. . . . . . . . . . .

O P I N I O N

Rendered on August 9, 2024

. . . . . . . . . . .

THOMAS J. CONNICK and EDWARD A. PROCTOR, Attorneys for Appellants

ERIN E. RHINEHART, MORGAN K. NAPIER, DREW H. CAMPBELL and
CHRISTOPHER P. GORDON, Attorneys for Appellees

. . . . . . . . . . . .

WELBAUM, J.

        **{¶ 1}** Plaintiffs-Appellants, Neha Desai and Monica Lennox (collectively,

"Plaintiffs") appeal from a trial court judgment granting the motion of Defendant-Appellee,

CareSource, Inc. ("CareSource") to strike Plaintiffs' class allegations. According to

Plaintiffs, the trial court incorrectly found the class definition ambiguous and overbroad when, in fact, Plaintiffs had presented a uniform theory of class-wide damages and a voluntary stipulation limiting their damages to that uniform theory. Plaintiffs further contend the court erred by failing to rigorously analyze every Civ.R. 23 element relating to class certification.

{¶ 2} For the reasons discussed below, we conclude that the trial court's decision was not supported by sound reasoning and was therefore an abuse of discretion. The court failed to consider any evidence the parties had submitted and did not conduct a rigorous analysis of the class definition, which was the only Civ.R. 23 factor it discussed. In light of this finding, which requires reversal, we need not address the court's failure to consider other factors in Civ.R. 23. Accordingly, the judgment of the trial court will be reversed, and this cause will be remanded for further proceedings.

I. Facts and Course of Proceedings

{¶ 3} In March 2018, Plaintiffs filed a class action complaint for damages and declaratory and equitable relief against CareSource. The complaint alleged that Plaintiffs, on behalf of themselves and other similarly situated individuals, sought redress for CareSource's violation of R.C. 1751.20 and 1751.31 and for CareSource's breach of contract, insurance bad faith, negligent misrepresentation, constructive fraud, and unjust enrichment. Complaint (March 13, 2018), ¶ 1. The complaint further alleged that Plaintiffs "and all class members have been and continue to be injured by CareSource, Inc.'s . . . pattern and practice of failing to provide its members with an accurate list of

Network of Providers or Marketplace Directories, as required by law, and by the terms and conditions of its policy of insurance." *Id.*

{¶ 4} In addition, Plaintiffs alleged that "CareSource's deceptive 'bait and switch' misrepresentations have induced plan members to enroll in CareSource's Just4Me Health Insurance Plan ('Just4Me' or 'the Plan') established by CareSource in response to the mandates of the Obama Administration's Patient Protection and Affordable Health Care Act ('ACA')." *Id.* According to the complaint, Plaintiffs and class members had to pay inflated premiums to use providers who were actually out-of-network, instead of being "in-network" as originally identified, had been forced to keep the original plan until the next enrollment period, and had been forced to abandon long-standing relationships with preferred providers to keep health insurance affordable. *Id.* at ¶ 2-3.

{¶ 5} The complaint also alleged that CareSource's misrepresentations were not limited to Just4Me Plan Participants, but that CareSource had also made misrepresentations to the State of Ohio annually to "qualify for the special privilege of being one of the limited providers allowed to sell health insurance on Ohio's 'Market Place Health Exchange.' " *Id.* at ¶ 4. According to the complaint, for a qualified health plan provider ("QHP") to participate in a state exchange, the QHP must, among other things, maintain " 'a network that is sufficient in number and types of providers, including providers that specialize in mental health and substance abuse services, to assure that all services will be accessible without unreasonable delay' " and " 'must make its provider directory . . . available to the Exchange for publication online . . . and to potential enrollees in hard copy upon request. In the provider directory, a QHP issuer must identify

providers that are not accepting new patients.' " *Id.* at ¶ 13, quoting 45 CFR 156.230(a)(2) and (b). Allegedly, CareSource's provider directory, while available online, was "wholly inadequate, inaccurate, incomplete, and mis[led] current and prospective enrollees." *Id.* at ¶ 14.

{¶ 6} Plaintiffs also alleged in the complaint that:

The premiums CareSource charges to Ohioans through Ohio's Marketplace Exchange are based in part on the size, scope and characteristics of CareSource's Network of Providers and Marketplace Directories.

Upon information and belief, each year since the inception of the Just4Me Plan, CareSource has misrepresented the size, scope and characteristics of its Network of Providers and Marketplace Directories.

Upon information and belief, expert testimony will reveal that CareSource is charging all participants of its Just4Me Plan an excessive premium due to the misrepresented size, scope, and characteristics of its Network of Providers and Marketplace Directories.

*Id.* at ¶ 31-33.

{¶ 7} As to Plaintiffs themselves, the complaint alleged they were eligible for benefits under the ACA, had researched plans offered in Ohio's Marketplace Exchange ("Ohio Exchange"), and had been attracted to CareSource due to its "alleged broad Network of Provider's [sic] and large Market Place Directory." *Id.* at ¶ 36. Plaintiffs further said they had been damaged by CareSource's misrepresented network through

paying premiums, and they specifically mentioned dental plans. *Id.* at ¶ 37-41.

{¶ 8} With exclusions for various persons or entities like CareSource employees, Plaintiffs defined the prospective class as: "All Ohio residents who purchased CareSource's Ohio Just4Me health insurance plans since 2014." *Id.* at ¶ 43. Finally, Appellants asserted eight claims. Besides the claims previously mentioned, Plaintiffs requested declaratory and injunctive relief. *Id.* at ¶ 56-153. Attached as Exhibit One to the Complaint was CareSource's 2016 "Evidence of Coverage and Health Insurance Contract" ("EOC"), a 147-page document.

{¶ 9} In April 2018, CareSource filed a notice of removal of the case to federal court. However, in May 2019, the case was remanded back to state court. CareSource then filed a motion in June 2019 asking the court to either dismiss the case or stay it pending an administrative review by the Ohio Department of Insurance ("ODI"). Plaintiffs responded and also voluntarily dismissed count one of the complaint, which pertained to unfair practices of health insurers. After the court noted the proper procedure was to file an amended complaint, Plaintiffs filed an amended complaint in October 2019, eliminating that count. The remaining claims were the same. In November 2019, CareSource filed another motion to stay the proceedings so the matter could be adjudicated administratively. However, in January 2020, the court denied CareSource's motion, finding that ODI did not have exclusive jurisdiction. CareSource then filed an answer to the amended complaint on January 30, 2020.

{¶ 10} In April 2020, the court adopted the parties' proposed pretrial order, which set a December 15, 2020 discovery deadline and a March 29, 2021 class certification

hearing; the hearing was later continued to August 11, 2021, then to August 30, 2021, and then to December 8, 2021.   On June 9, 2021, the parties filed a joint motion asking the court to permit Plaintiffs' motion for class certification to be filed under seal.   After the court granted the motion, Plaintiffs filed their motion for class certification under seal on June 15, 2021.   Thereafter, most dispositive pleadings were filed under seal, with no public access.   On July 15, 2021, CareSource responded to the class certification motion and also filed a motion for summary judgment.   Plaintiffs responded to the summary judgment motion and filed a reply in support of certification on September 15, 2021. CareSource followed this with a surreply concerning certification and a summary judgment reply on October 26, 2021.

{¶ 11} The trial court overruled the summary judgment motion in part and sustained it in part in November 2021.   In its decision, the court noted testimony from Lennox and Desai.   Lennox had stated that she looked at CareSource's online directory before purchasing a policy and had chosen it as her insurer because of a provider list that was no longer available to her.   She did not receive her first choice of provider or even her third.   After enrolling, Lennox called more than ten providers but did not speak to them other than to ask if they accepted CareSource.   Four of them did, and she made two appointments.   However, both practices called back and said they only took Medicaid.   Decision, Order and Entry Sustaining in Part and Overruling in Part Defendant CareSource's Motion for Summary Judgment ("SJ Decision") (Nov. 16, 2021), p. 7-8.

{¶ 12} Similarly, Desai looked at the online directory and chose to enroll in CareSource because of the provider list that was supplied and the premium associated

with that list. Desai wanted a provider based on what its options were, which included wanting a provider who worked on weekends. However, she ended up not being able to find one and had to miss work to see a physician. During this process, Desai called about 20 providers who said they were no longer in network and were no longer accepting CareSource. Desai was very frustrated and no longer wanted to be insured with CareSource. However, she could not choose a different insurer until the next enrollment period. She decided not to re-enroll with CareSource at the end of 2018. *Id*. at p. 9-11.

{¶ 13} The summary judgment decision also noted testimony from Plaintiffs' expert, David Axene, who stated several reasons why inaccuracies in CareSource's provider listing resulted "in a health benefit plan with lesser economic value than initially offered to such prospective members." *Id*. at p. 11. These included the fact that, based on a statistically sound survey of CareSource's own provider list, "only 37% of the providers listed could be contacted using the information presented in the provider listing and obtain services covered by CareSource as an in-network provider (i.e., actually had accurate contact information, actually treated patients at the address listed, accepted CareSource and were accepting new CareSource patients)." *Id*. at p. 12. Axene also said that "[s]lightly less than two-thirds (i.e., 63%) of the providers listed as network providers were inaccurately listed as network providers and patients could not seek care from them within the CareSource network. This results in a substantial reduction in economic value of the policy they purchased." *Id*.

{¶ 14} Axene further stated, among other things, that:

18. The inaccuracy of the CareSource provider listing at a minimum

reduces the value of the product purchased by 92% - 94% when discovering the selected provider is out of network, a substantial reduction.

19. Applying the results of the statistical study to the impact of out-of-network providers on the Actuarial Value of coverage, I project that the reduction in economic value of the purchased coverage is 58%.

20. The financial value of this can be calculated by multiplying the premiums paid by members over the class period by 58%. Individual damages for each member would be equal to 58% of the premiums they paid for this coverage.

21. Based upon publicly available information for the time period 2014-2019, CareSource reported collected premiums during this period of about $1.37 billion. Applying the 58% to this premium volume would result in damages during 2014-2019 of $795 million. It is my understanding that the class period extends through to trial which would increase estimated damages when including premiums for 2020 and 2021.

SJ Decision at p. 12.

{¶ 15} As to Plaintiffs' breach of contract claim, the court stated that, "[a]ccording to Plaintiffs, during the open enrollment period, prospective insureds were provided access to a summary of benefits, the network provider directory, and expected premium amounts. Insureds were not given an opportunity to review EOC until after they enrolled, as insureds with CareSource did not receive CareSource's EOC until after enrollment. Accordingly, while no insured was given his or her respective EOC until after enrollment,

insureds were nevertheless locked into that program until the next open enrollment period one year later." *Id.* at p. 21-22. In addition, the court commented that "the crux of Plaintiffs' breach of contract claim was that Plaintiffs did not receive the benefit of their bargain, and, thus, Plaintiffs and all putative class members were damaged by paying larger premiums for a smaller network than they bargained for." *Id.* at p. 29-30. Based on the following analysis, the court found genuine issues of material fact and denied summary judgment on this claim. As the court noted:

> In this case, while Defendant CareSource argued that its network directory was merely a tool and, thus, it was not incorporated into the EOC as a part of the contract, the EOC described the methods by which an insured may identify a provider by "either calling Member Services at the toll-free telephone number on your ID card or by logging onto our website." The EOC further directed the insureds to the directory of Network Providers on the website at www.CareSource.com/marketplace, specifying that the online directory was updated at least monthly. Additionally, the directory of network providers was among the documentation submitted to the Marketplace in order to participate in the ACA program.

> Here, Plaintiffs' allegations and evidence implicate the alleged contractual entitlement to a current list of network providers, and, thus, a reasonable juror could conclude that Defendant CareSource "failed to provide an accurate list of in-network providers, failed to provide adequate access to medical providers, and have not delivered to the insureds benefits

consistent with their supposed coverage, in breach of the policy." *See Duff v. Centene Corp.* (2021), 2021 U.S. Dist. LEXIS 190539.

SJ Decision at p. 30.

{¶ 16} The trial court also found genuine issues of fact regarding Plaintiffs' insurance bad faith claim, remarking that "[t]he crux of Plaintiffs' insurance bad faith claim pertains to CareSource's failure in carrying out its responsibilities under the policies, namely CareSource's failure to provide correct and up-to-date network directories, thereby misrepresenting the scope of coverage, which is arguably more than a refusal to pay a claim." *Id.* at p. 33. Concerning the negligent misrepresentation claim, the court noted Plaintiffs' statement that they were choosing not to further prosecute this claim; as a result, the court sustained CareSource's summary judgment motion on that claim. *Id.* at p. 34-35. However, the court found genuine issues of material fact concerning Plaintiffs' constructive fraud and unjust enrichment claims, their request for a declaratory judgment, and their request for injunctive relief. *Id.* at p. 38-45.

{¶ 17} The class certification hearing did not take place in December 2021 as anticipated; it was tentatively rescheduled for April 14, 2022. However, at the parties' joint request, the court continued the hearing and said it would reset the hearing date after resolving pending motions. Proposed Order Granting . . . Joint Motion to Continue Class Certification Hearing (Mar. 22, 2022), p. 1. After receiving leave of court, Plaintiffs filed a second amended complaint adding a third plaintiff, Heather Chelsa, who sought a claim for injunctive relief only. *See* Plaintiff's Second Amended Class Action Complaint for Damages, and Declaratory and Equitable Relief ("SAC") (Aug. 12, 2022), p. 1 and fn.

1. The proposed class remained the same. *Id.* at p. 10. Plaintiffs also eliminated the negligent misrepresentation claim, but the prior claims remained. CareSource filed its answer to the SAC in August 2022, and in October, the court set a class certification hearing for January 27, 2023. Also in October 2022, Chelsa filed a notice of dismissal of her claims against CareSource without prejudice.

{¶ 18} The class hearing again did not go forward as scheduled because the trial judge was elected to the court of appeals in November 2022. The Supreme Court of Ohio appointed a visiting judge in March 2023, and he set a class certification hearing for June 13-15, 2023. CareSource then, on March 29, 2023, filed a motion to strike Plaintiffs' motion for class certification.

{¶ 19} Before the scheduled hearing, Plaintiffs filed the following evidentiary stipulation for purposes of clarifying the issues before the court on certification:

Whether a CareSource MarketPlace insured subsequently saw a doctor, had a claim paid or denied, or was billed for out-of-network services during the class period is wholly irrelevant to Plaintiffs' class-wide claims and damages. Therefore, Plaintiffs hereby stipulate and represent to the Court that they will not submit, or attempt to submit, any such evidence in support of their liability and damage claims at trial.

Plaintiffs' Evidentiary Stipulation (May 4, 2023), p. 1.

{¶ 20} On the same day, Plaintiffs asked the court to hear the certification matter based on the parties' briefs and on the record that had already been developed; they also filed a memorandum opposing CareSource's motion to strike the motion for class

certification. CareSource filed its reply memorandum on May 17, 2023, and filed various depositions in support of its motion on May 18, 2023. On May 24, 2023, Plaintiffs filed a reply memorandum in support of their motion for class certification.

{¶ 21} A new judge was sworn in on June 20, 2023, and then began handling the case. On June 22, 2023, CareSouce filed a motion for leave to file a surreply opposing the certification motion; the judge granted leave on June 28, deeming the surreply filed as of that date. No evidentiary hearing took place, and on October 12, 2023, the court granted CareSources's motion to strike the class certification. Appellants then timely appealed to our court.

## II. Alleged Error in Considering the Class Definition

{¶ 22} Plaintiffs' first assignment of error states that:

The Trial Court Committed a Clear Error of Law and Obvious Mistake of Fact by Finding the Class Definition "Ambiguous and Overbroad" Despite Appellants' Uniform Theory of Class-Wide Damages and Voluntary Stipulation.

{¶ 23} Under this assignment of error, Plaintiffs contend that the trial court erred in various respects, including relying on unrelated factual allegations rather than the relevant evidentiary record and ignoring Plaintiffs' evidentiary stipulation. In addition, Plaintiffs argue that the trial court failed to understand class certification law. Before discussing

Plaintiffs' arguments, we will briefly outline standards that apply to class certification.

## A. Class Certification Standards

{¶ 24} "The procedural aspects of class-action litigation in Ohio are controlled by Fed.R.Civ.P. 23 and Civ.R. 23, depending on whether the matter proceeds in a federal or state court in Ohio. . . . Because the Ohio Rules of Civil Procedure are modeled after the Federal Rules of Civil Procedure, federal law interpreting the federal rule is appropriate and persuasive authority in interpreting a similar Ohio rule." *Felix v. Ganley Chevrolet, Inc.*, 2015-Ohio-3430, ¶ 24, citing *Stammco, L.L.C. v. United Tel. Co. of Ohio*, 2013-Ohio-3019, ¶ 18. Here, Ohio's Civ.R. 23 applies.

{¶ 25} "A party seeking certification pursuant to Civ.R. 23 bears the burden of demonstrating by a preponderance of the evidence that the proposed class meets each of the requirements set forth in the rule." C*ullen v. State Farm Mut. Auto. Ins. Co.*, 2013-Ohio-4733, paragraph three of the syllabus. The following requirements must be met for class actions to be maintained under Civ.R. 23: "(1) an identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impracticable; (4) there must be questions of law or fact common to the class; (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the interests of the class; and (7) one of the three Civ.R. 23(B) requirements must be met." *Hamilton v. Ohio Sav. Bank*, 82 Ohio St.3d 67, 71 (1988), citing Civ.R. 23(A) and (B) and *Warner*

*v. Waste Mgt., Inc.*, 36 Ohio St.3d 91 (1988). Certification is defeated if any prerequisite is not met. *Stammco* at ¶ 24, citing *Schmidt v. Avco Corp.*, 15 Ohio St.3d 310, 313 (1984).

**{¶ 26}** Trial courts have broad discretion in deciding if class actions may be maintained. Review, therefore, is for abuse of discretion. *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho*, 52 Ohio St.3d 56, 62 (1990), citing *Marks v. C.P. Chem. Co.*, 31 Ohio St.3d 200 (1987). This standard in class actions "is grounded not in credibility assessment, but in the trial court's special expertise and familiarity with case-management problems and its inherent power to manage its own docket." *Hamilton* at 70. Nonetheless, "the trial court's discretion in deciding whether to certify a class action is not unlimited, and indeed is bounded by and must be exercised within the framework of Civ.R. 23. The trial court is required to carefully apply the class action requirements and conduct a rigorous analysis into whether the prerequisites of Civ.R. 23 have been satisfied." *Id.*, citing *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160-162 (1982).

**{¶ 27}** A rigorous analysis "often requires looking into enmeshed legal and factual issues that are part of the merits of the plaintiff's underlying claims." *Felix,* 2015-Ohio-3430, at ¶ 26, citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). "In doing so, however, the trial court may probe the underlying merits of the cause of action only for the purpose of determining that the plaintiff has satisfied Civ.R. 23." *Id.*, citing *Stammco,* 2013-Ohio-3019, at ¶ 40.

**{¶ 28}** "For an abuse of discretion to have occurred, the trial court must have taken action that is unreasonable, arbitrary, or unconscionable." *Estate of Johnson v. Randall*

*Smith, Inc.*, 2013-Ohio-1507, ¶ 22, citing *State ex rel. Beacon Journal Publishing Co. v. Akron*, 2004-Ohio-6557, ¶ 59. "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). Decisions are unreasonable if they are unsupported by a sound reasoning process. *Id.*

**{¶ 29}** With these standards in mind, we will consider the trial court's decision.

### B. Discussion

**{¶ 30}** As noted, the proposed class definition was: "All Ohio residents who purchased CareSource's Ohio Just4Me health insurance plans since 2014." Complaint at ¶ 43; SAC at ¶ 43. Here, the trial court analyzed only the first requirement in Civ.R. 23(A), finding the class definition "overbroad and ambiguous." Decision and Entry Sustaining Defendant's Motion To Strike Class Allegations ("Class Decision") (Oct. 12, 2023), p. 11. The court's actual discussion of the class definition was brief, consisting of only two pages. The court began this discussion by focusing on the allegations in the complaint, including the allegation "that, as a result of CareSource's pattern and practice of failing to provide accurate provider lists, Plaintiffs and the putative class members were forced to pay inflated premiums for their insurance coverage and to use out-of-network providers who were originally identified in the plan as in-network, resulting in increased costs." *Id.* at p. 10.

**{¶ 31}** In considering the class definition, the court stated:

In the instant case, the definition is overbroad because it seemingly includes every person who purchased Just4me insurance from CareSource since 2014, regardless of whether the insureds can assert any of the claims made by Plaintiffs in the SAC. Furthermore, the existing class definition fails to provide the Court with any means of discerning which, if any, of the proposed class members suffered from the alleged conduct of CareSource described in the SAC without the Court having to conduct individual determinations.

. . . Because of the definitional requirements contained in Civ.R. 23(A), CareSource's client records and policy contracts alone would not establish whether a particular client would be a member of the purported class; it would necessarily require an individualized determination of each case prior to determining membership in the class, and that would [be] administratively infeasible.

Class Decision at p. 11.

{¶ 32} In terms of being identifiable, "the class definition must be precise enough 'to permit identification within a reasonable effort.' " *Hamilton*, 82 Ohio St.3d at 72, quoting *Warner*, 36 Ohio St.3d at 96. "The focus at this stage is on how the class is defined. 'The test is whether the means is specified at the time of certification to determine whether a particular individual is a member of the class.' " *Id.* at 73, quoting *Planned Parenthood*, 52 Ohio St.3d at 56. "The definition of the class must be unambiguous. Classes such as 'all people active in the peace movement,' 'all people

who have been or may be harassed by the police' and 'all poor people,' are too amorphous to permit identification within a reasonable effort and thus may not be certified." *Warner* at 96.

**{¶ 33}** As an example, in *Bowen v. Farmers Ins. Co.*, 2018-Ohio-1638 (8th Dist.), the court found a class definition unambiguous and sufficiently identifiable where it was defined as " 'all persons who purchased automobile insurance from Farmers and paid premiums identified as paying for UM coverage on more than one vehicle in the household at any time during the period October 1994 through September 1997.' " *Id.* at ¶ 18. The court concluded that "[t]his information – whether an insured paid multiple UM premiums for UM coverage – could be easily obtained by reviewing Farmers' business records." *Id.* at ¶ 29. The same point is true here, as information on the identities of persons purchasing the pertinent CareSource policies since 2014 would be available in CareSource's records.

**{¶ 34}** In *Bowen*, the court also stressed that "the identifiable class requirement is not to be confused with the predominance requirement set forth in Civ.R. 23(B)(3)." *Id.* at ¶ 17, citing *Clark v. Park 'n Fly*, 2011-Ohio-323, ¶ 18 (8th Dist.). "The predominance requirement inquires whether 'separate adjudications are likely required to finally determine the action.' " *Id.*, quoting *Hamilton* at 73. In contrast, the focus during the identification stage is " 'on how the class is defined.' " *Id.* In the case before us, the trial court's focus on individualized determinations relates to predominance rather than to identification of the class.

**{¶ 35}** On the subject of breadth, where " 'a class is defined so broadly as to

include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.' " *Stammco*, 2013-Ohio-3019, at ¶ 53, quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012). For example, in *Stammco*, the plaintiffs had sued United Telephone Company of Ohio ("UTO"), which had provided plaintiffs with local and long-distance phone service. The amended complaint alleged that the plaintiffs' "phone bills from UTO also contained unauthorized charges from third parties, as part of a practice known as 'cramming.' " *Id.* at ¶ 5. The amended complaint further alleged liability based on: "(1) negligent billing, (2) 'breach of the duty of good faith and fair dealing implied in contract,' and (3) unjust enrichment," and it sought "injunctive relief and compensatory damages." *Id.*

{¶ 36} During a prior appeal in *Stammco*, the Supreme Court of Ohio had held that " 'the class as originally certified was not readily identifiable without expending more than a reasonable effort, because the trial court would have to determine individually whether and how each prospective class member had authorized third-party charges on his or her phone bill.' " *Id.* at ¶ 54, quoting *Stammco, L.L.C. v. United Tel. Co. of Ohio*, 2010-Ohio-1042, ¶ 10. On remand, the plaintiffs in *Stammco* proposed the following class: " 'All individuals, businesses or other entities . . . who were billed for third party charges as to which [UTO] had no prior authorization from the customer in writing or by a method acceptable to [UTO] sufficient for [UTO] to verify that the customer had agreed to such charge.' " *Stammco*, 2013-Ohio-3019, at ¶ 55.

{¶ 37} After the trial court once again denied certification, the court of appeals

reversed. *Id.* at ¶ 2. On further appeal, the Supreme Court of Ohio found the trial court had erred in denying certification on the basis that plaintiffs would eventually lose on the merits. However, it also agreed that class certification was improper**.** *Id.* at ¶ 51. In this regard, the court stated: "the proposed amended class is too broad. UTO has no records regarding which charges are authorized and which are not. Under the proposed amended class, every person who was billed a third-party charge for which UTO had no prior authorization is now a class member even if the third-party charge was proper." *Id.* at ¶ 56.

{¶ 38} In discussing commonality (as opposed to breadth), the Supreme Court of Ohio mentioned other facts that are instructive here. Specifically, as noted, the charges on UTO's bills were from third parties, not UTO. Additionally, UTO did not "routinely receive, have, or maintain any records of the end users' requests for or authorization or receipt of any specific third-party services." *Id.* at 60. Instead, third-party providers had that information; UTO's role was simply to deliver these providers' bill to end users. *Id.* Furthermore, while UTO apparently had a database reflecting adjustments it made for customers, the database did not indicate why adjustments were made, and UTO indicated adjustments could be made for various reasons, including correction of clerical errors and mistakes. *Id.* at ¶ 61-62. Under the circumstances, the court found the database lacked any probative evidence that would help in identifying unauthorized third-party charges. *Id.* at ¶ 63.

{¶ 39} That is not the case here, as the relevant records would be in CareSource's database. Under the theory Plaintiffs advanced and supported below, the relevant

issues were whether CareSource's directory was inaccurate and whether, due to the inaccuracy, class members paid more than they should have for their policies.

**{¶ 40}** According to CareSource, Plaintiffs' damages theory was "newly minted" in light of the May 4, 2023 stipulation Plaintiffs made about their damages request. CareSource Brief, p. 22. In addition, CareSource argues Plaintiffs waived this point by failing to separately discuss the stipulation in their response to CareSource's motion to strike. *Id.* at p. 19. Contrary to these claims, the damages theory was before the trial court years before the motion to strike was filed, i.e. in June 2021, when Plaintiffs filed their motion to certify. The stipulation was also consistent with the evidence Plaintiffs presented in their motion to certify. This was nearly two years before Plaintiffs filed their stipulation and response to CareSource's motion to strike.

**{¶ 41}** In the 2021 motion to certify, Plaintiffs presented the following evidence: deposition testimony from class representatives who, after enrolling, called many listed providers and learned they were not in network or did not accept CareSource insurance; testimony from CareSource employees who indicated that CareSource did not have a measure for network accuracy; testimony from a statistical expert who calculated that only 37% of the listed providers in CareSource's network provider directory accepted CareSource insurance; and testimony from an actuarial expert who stated that the loss to class members was the decrease in the value of their policies due to the inaccurate directory. *See* Plaintiffs' Motion to Certify Class Action ("Cert. Motion") (June 15, 2021), p. 5-7, 12-13, and 17. *See also* the following exhibits attached to the Cert. Motion: Ex. 1 (Desai Deposition), 35-36 and 51; Ex. 2 (Lennox Deposition), 7-8 and 77-79; Ex. 5

(Wheatley Deposition), 36, 42, 69-75, and 120; Ex. 6 (Farrell Deposition), 51-55, 232, and 244; Ex. 8 (Jun Li Affidavit and attached Statistical Survey Report, p. 3-4); and Ex. 9 (Axene Affidavit and Expert Report attached as Ex. 1, p. 3-5, 13-14, and 16-18).

{¶ 42} In the motion to certify, Plaintiffs also discussed whether there was a common liability issue, i.e., a common set of law and facts. *Id.* at p. 14-16. These matters all involved issues pertaining to CareSource's conduct that would apply to an entire class, such as:

a. Whether CareSource's provider lists for its Ohio MarketPlace Plan were inaccurate and complete at any time they were published to current or prospective members; b. Whether the inaccuracies in CareSource's provider lists constitute a breach of CareSource's contract with the Plaintiffs and Class members: c. Whether CareSource failed to disclose to insured's [sic] and/or prospective insured's [sic] that its MarketPlace Exchange provider lists were inaccurate, incomplete, and not up to date at any time they were published to insureds and/or prospective insureds; d. Whether CareSource's pattern and practice of failing to comply with their legal and contractual obligations to maintain accurate, complete and up-to-date provider lists constitute insurance bad faith. . . . [and] j. Whether CareSource's misrepresentations on the inaccuracies of its Network of Providers and MarketPlace Directories adversely affects premiums to its MarketPlace Participants.

Cert. Motion at p. 15.

{¶ 43} Using "Actuarial Value" methodology and applying Jun Li's statistical study, Axene estimated the damage of class members as a whole between 2014 and 2019 to be around $795 million dollars, based on their overpaid premiums. Ex. 9 at p. 4. He explained the basis for his opinion in detail. *Id.* at p. 3-4 and 8-19. Based on his expertise, which included many years both of actuarial consulting experience with health insurance companies and of health-care management, Axene stated (among other things) that "the economic value of an insurance product is highly dependent upon the provider network as stated by the insurance company. Any inaccuracies in the presentation of network, particularly the inclusion of providers that are not in the network, diminishes the economic value of the network and in turn the value of the insurance product." *Id.* at p. 1 and 18. Axene further stated that "[t]his diminished value impacts all members whether or not they seek care from such inaccurately portrayed provider, and whether or not they ever examined the network on the insurance company's website." *Id.* at p. 18. Again, this is consistent with the May 4, 2023 stipulation.

{¶ 44} In response to the motion to certify, CareSource claimed, as it has since, that individual inquiries needed to be made to determine what each class member read and relied on. Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Cert. Opp.") (July 15, 2021), p. 2-3, and 13-14. CareSource further argued that no claim based on inflated premium rates could be made because CareSource does not consider the size of provider networks in figuring premium rates. *Id.* at p. 21-24. This latter point was supported by Scott Brockman's expert report, which was attached to CareSource's memorandum as Exhibit 4. Brockman was the vice-

president of actuarial science at CareSource, i.e., a CareSource employee, and he explained the criteria the company used in evaluating premiums, which did not include the breadth of the provider program. Ex. 4, p. 1 and 4-5. However, what CareSource itself considered is irrelevant and is the wrong focus. The point Axene made was that consumers were damaged by the network's inaccuracy and paid more than they should have for the coverage they received.

{¶ 45} CareSource also focused on the fact that Plaintiffs could not show that they had relied on the EOC, which they received after they enrolled in the policy. Cert. Opp. at p. 30. Again, this is the wrong consideration. The claim was that, because the provider directory was inadequate, Plaintiffs were damaged at the point that they enrolled, i.e., before they received a policy. Plaintiffs addressed this point in their certification reply memorandum, in which they stated that:

> [T]his case boils down to two questions: (1) does CareSource's persistent failure to maintain an accurate provider directory breach its uniform contract with insureds? (liability) and (2) have insureds suffered a uniform loss in the policy's Economic Value at the point-of-sale that may be recovered as class damages? (damages). Ohio Civ.R. 23 answers "yes" to both questions.

Reply Brief in Support of Class Certification ("Cert. Reply") (Sept. 15, 2021), p. 2.

{¶ 46} Plaintiffs also attached Axene's rebuttal report to this reply. In the rebuttal report, Axene reiterated his prior conclusions, responded to Brockman's statements, and adjusted his range of damages estimates to reflect realistic portions of care sought through non-network providers. This resulted in class damages ranging from 67 million

to 794 million dollars. *See* Cert. Reply, Ex. 6 (Axene Sept. 3, 2021 Rebuttal Report), p. 3. Plaintiffs further stated in their reply that "CareSource's catastrophic understatement of its Network of Providers to prospective and current insureds serves as the basis for Plaintiffs' uniform and actuarially calculated damages on the date they purchased their policies, not their individual experiences once they finally located a doctor." Cert. Reply at p. 14. Notably, "[i]naccurate directories are known as 'ghost networks' or 'phantom networks' and are a pervasive issue in the American health care system." Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 Yale L. & Policy Rev. 78, 81 (2021).

{¶ 47} As indicated, Plaintiffs' motion to certify was filed in June 2021. Thus, when it ruled on summary judgment in November 2021, the trial court would have been aware of Plaintiffs' position and theory. In fact, Plaintiffs reiterated their stance on the relevant issues when they responded to CareSource's summary judgment motion. *See* Plaintiffs' Opposition to CareSource's Motion for Summary Judgment (Sept. 15, 2021), p. 2. As with the certification motion, Plaintiffs included Axene's expert and rebuttal reports as well as Jun Li's expert report in their summary judgment response. *Id.* at p. 2, fn. 1; p. 10, fn. 24; and attached Exhibits 1, 2, 3, and 16.

{¶ 48} In its decision denying summary judgment to CareSource on all grounds other than negligent misrepresentation, the trial court outlined a large portion of Axene's report. SJ Decision at p. 11-17. The court further noted Plaintiffs' position, stating that:

> As to their breach of contract claim, Plaintiffs argued that the health
> insurance policy, which constituted a product, was purchased by way of the

EOC; that the product had three elements that constituted its economic value, including the schedule of benefits, the list of providers who accepted the insurance, and the stated premiums that entitled a purchaser to services from providers; that one element of value, namely the network of providers, was only 37% of what was represented, thereby failing to deliver the full contracted value to the insured and constituting a breach of contract; that, because there were significantly fewer providers in CareSource's network than what was represented in its directory, Plaintiffs and putative class members in CareSource's plans did not receive the full benefit of what they bargained for; that, because of CareSource's failure to send notice of physicians' removal from its provider network, Plaintiffs and putative class members were unable to accurately evaluate CareSource's Plan in comparison to other plans available in the Marketplace during open enrollment periods; and that Plaintiffs and putative class members were damaged by paying larger premiums for smaller networks than they bargained for.   Plaintiffs sought damages for their breach of contract claim under a diminished value theory.   The crux of this damages theory is that the value of Plaintiffs' health insurance policy under the EOC was diminished by Defendant CareSource's failure to provide an accurate and up-to-date provider directory, resulting in Plaintiffs paying larger premiums for smaller networks than they bargained for, which appears to be a matter of first impression for this court.

SJ Decision at p. 21-22.

{¶ 49} Although CareSource argued on summary judgment that Plaintiffs could not recover under a diminished value theory, the trial court denied CareSource summary judgment on the breach of contract claim. In this regard, the court stated that: "Here, Plaintiffs' allegations and evidence implicate the alleged contractual entitlement to a current list of network providers, and, thus, a reasonable juror could conclude that Defendant CareSource 'failed to provide an accurate list of in-network providers, failed to provide adequate access to medical providers, and have not delivered to the insureds benefits consistent with their supposed coverage, in breach of the policy.' " *Id.* at p. 30, citing (but actually quoting) *Duff v. Centene Corp.*, 565 F.Supp.3d 1004, 1020 (S.D. Ohio 2021).

{¶ 50} *Duff* does not strictly apply here, as it did not deal with class certification but only with a motion to dismiss (which was denied as to the claims against the parent company insurer). *Duff* also did not discuss diminished value. However, in addition to denying dismissal of a breach of contract claim, *Duff* allowed a bad faith insurance claim to proceed, noting that misrepresenting the scope of coverage supported this claim. *Id.* at 1022.

{¶ 51} In any event, Plaintiffs clearly raised their damages theory in moving to certify the class and in responding to the summary judgment motion. They also continued to assert the same points in response to CareSource's motion to strike the class allegations. *See* Plaintiffs' Opposition to CareSource's Motion to Strike Class Allegations ("Strike Opp.") (May 4, 2023), p. 4, 9, 11, and 19-21. In addition, Plaintiffs

again attached Axene's expert report and rebuttal report, and Jun Li's expert report to the Strike Opp. *Id.* at p. 3, fn. 2; p. 4, fn. 4; and attached Exs. 1, 2, 3, and 4. Accordingly, there is no basis for finding a waiver of any argument or that this was a "newly minted" theory. Furthermore, the stipulation was not really necessary, as Plaintiffs had already asserted the same position that the stipulation reflected.

{¶ 52} Although a stipulation was not needed, it would still be binding on Plaintiffs. In general, a "stipulation" is " 'a voluntary agreement between opposing parties concerning some relevant point; esp., an agreement relating to a proceeding, made by attorneys representing adverse parties to the proceeding.' " *Disciplinary Counsel v. Harmon*, 2019-Ohio-4171, ¶ 25, quoting *Black's Law Dictionary* 1641 (10th Ed. 2014). "A stipulation in law is nothing more than agreement as to the veracity of a fact in issue." *State v. Tate*, 2014-Ohio-44, ¶ 19. "It is the province of the court to determine the legal effect of the stipulated facts." *Augaitis v. Reichard*, 1993 WL 239579, *9 (2d Dist. June 28, 1993). Nonetheless, a party may certainly stipulate to certain legal issues like its own negligence. *Id.* (noting defendant stipulated to the amount of damages and that they were caused by his failure to exercise reasonable and ordinary care in performing an inspection).

{¶ 53} A stipulation, however, need not be by agreement of the parties. "A stipulation cannot be used against a party who had not agreed thereto because, as to the non-agreeing party, it is not a stipulation and, therefore, it is not usable against him." *Burdge v. Bd. of Cty. Commrs.*, 7 Ohio App.3d 356, 358 (10th Dist.1982). Still, a stipulation will be binding on the party who made it. For example, during opening

statement in an adverse possession case, plaintiff's counsel stipulated that the property on which plaintiff's fence stood was within the adjoining landowners' plot. *Didday v. Bradburn*, 2000 WL 197245, *4 (12th Dist. Feb. 22, 2000). When the plaintiff attempted to argue otherwise on appeal, the court found she was bound by her stipulation. *Id.* That is not the situation here, however. Plaintiffs are not trying to bind CareSource by their stipulation; they are simply restricting their own claim of damages. Regardless, as noted, the stipulation was not required.

**{¶ 54}** We note that in response to this assignment of error, CareSource conceded that the trial court never decided the propriety of Plaintiffs' damages theory and that the issue is not before this court. CareSource Brief at p. 22 (noting that " 'interlocutory class certification is not the place for answering the legal questions relevant to success on the merits' "). We agree.

**{¶ 55}** Despite this concession, CareSource discussed this issue. *Id.* at p. 22-23. We decline to do so, although we do briefly note that in a case involving overcharges for workers' compensation premiums, the Eight District affirmed a trial court's class certification. *See San Allen, Inc. v. Buehrer*, 2011-Ohio-1676, (8th Dist.). In that case, the court of appeals rejected the Bureau's assertion that the class was overly broad because it included persons who suffered no injury due to the Bureau's group-experience rating plan and also included persons who had received an economic benefit due to the rating plan. *Id.* at 9. The court concluded that this latter situation simply raised a recoupment issue. *Id.* In addition, the court found that since "the class definition is limited to those who claim to have suffered a common, class-wide injury, i.e., an

overcharge in their premiums through inflated base rates, the class definition is not overly broad." *Id.* at ¶ 9.

**{¶ 56}** It is true that Desai, for example, testified that when enrolling for insurance, she looked at CareSource's online provider directory and chose it because of the large provider list. Desai Deposition, 42 and 46. However, Desai further stated that she also chose CareSource because of the premium that reflected the provider list and that she did not receive the full benefit of her bargain with CareSource because of inaccuracies in the list. *Id.* at 46 and 71. After purchasing the insurance, Desai discovered multiple instances where providers did not accept it. *Id.* at 32-33. Likewise, Lennox stated that CareSource had an inaccurate provider list and that she and others had purchased plans in part based on the list. She believed they were fooled into buying something they did not receive. Lennox Deposition at 104.

**{¶ 57}** "A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41. While there is no independent action for breach of the implied duty of good faith and fair dealing, this duty is part of every contract. *Id.* at 41-44. Thus, if this case is classified as a breach of contract case, i.e., for failing to comply with the contract (as one would expect accurate directories), the issue of individual reliance is irrelevant. As indicated in the materials submitted to the trial court, in its yearly EOC sent to enrollees between 2013 and 2016, CareSource stressed that enrollees could find information about CareSource's "broad network" of providers on

CareSource's website. *See* Cert. Reply at p. 4 and Ex. 1(a)-(i) attached to the reply. This was a representation made to all enrollees, and a decrease to 37% of listed providers hardly fit that description.

{¶ 58} Additionally, concerning the subject of reliance:

Consumers' reliance on directories to make coverage decisions manifests in three ways. First, some consumers will seek out plans that include specific doctors or medical systems. . . . Second, the general size of a network, including the number of in-network doctors available within a reasonable distance, is important to consumers. . . . The directory listing of the number of doctors accepting new patients in their area is one of the best proxies that consumers have for network size. Third, implicit in consumers' reliance on directories to make purchasing decisions is a belief that the directories are accurate and that the cost of their premiums includes access to reliable directory listings. . . . Had JA, a cancer patient whose experiences will be described in more detail below, known that she would have to call two hundred providers looking for a surgical oncologist before finding a single one who actually was, that fact likely would have affected her choice of plan.

Overall, false directory entries economically injure all plan enrollees by making coverage seem much more valuable than it is, inducing consumers to unwittingly purchase a "damaged product." . . . The fact that directories tend to be approximately fifty percent inaccurate means that

insurers are routinely promising consumers fifty percent more access than is actually available, and consumers are, in turn, paying for fifty percent more access than they actually have. . . . Directory errors are thus consumer deception on a massive scale, the equivalent of the entire credit card industry routinely charging every consumer double the advertised interest rate.

(Footnotes omitted.) Burman, 40 Yale L. & Policy Rev. at 86-87.

{¶ 59} As a further matter, Plaintiffs requested injunctive and declaratory class-wide relief in addition to damages. This was based on CareSource's continuing conduct after the complaint was filed. *See* Complaint at ¶ 55 and 143-153; SAC, ¶ 55 and 136-146. The trial court denied summary judgment on those claims as well. SJ Decision at p. 41-45. Even looking just at the face of the complaint, there was no way these claims could have involved individualized determinations for particular insured parties.

{¶ 60} Having reviewed the party's briefs and the relevant and extensive record, which includes more than a thousand pages of motions, memoranda, and attachments, we conclude that the trial court's decision was not supported by sound reasoning and was an abuse of discretion. The court's evaluation was not rigorous and referred only to allegations in the complaints and not to any evidence that was submitted.

{¶ 61} In this regard, we note that the trial court's decision granted the motion to strike the class allegations rather than denying the class certification motion. Concerning this process, Civ.R. 23(D) provides, in pertinent part, that: "(1) In General. In conducting an action under this rule, the court may issue orders that: . . . (d) require that the pleadings

be amended to eliminate allegations about representation of absent persons, and that the action proceed accordingly. . . ." Typically, Ohio courts have used Civ.R. 23(D) to consider whether the pleadings allege operative facts sufficient to allow a class action to go forward. *See Cubberley v. Chrysler Corp.*, 70 Ohio App.2d 263, 267 and fn. 2 (8th Dist.1981). *Accord Sliwinski v. Capital Properties Mgt. Ltd.*, 2012-Ohio-1822, ¶ 14 (9th Dist.); *Midland Funding LLC v. Hottenroth*, 2023-Ohio-923, ¶ 30 (8th Dist.).

{¶ 62} In contrast to a motion to strike, Civ.R. 23(C)(1)(a) states that "[a]t an early practicable time after a person sues or is sued as a class representative, the court shall determine by order whether to certify the action as a class action." This imposes "a mandatory duty upon the trial court to make a prompt determination as to the compliance of a purported class action with all of the requirements of Civ. R. 23." *Bass v. Ohio Med. Indemn. Inc.*, 1977 WL 199736, *2 (1st Dist. Aug. 3, 1977). Here, removal to federal court and the need to conduct discovery took substantial time. However, when a decision was made, it was not based on any evidence even though significant discovery had been conducted and much evidence had been submitted.

{¶ 63} Under R.C. 2505.02(A)(3), orders granting or denying certification of class actions are final appealable orders. This statute does not mention orders granting motions to strike class allegations. However, granting such a motion effectively creates a denial of class action certification, and this is why immediate appeal is allowed. *E.g., Begala v. PNC Bank, Ohio, Natl. Assn.*, 1999 WL 1264187, *1, fn. 2 (1st Dist. Dec 30, 1999). Thus, there is no real functional difference between granting a motion to strike class allegations and denying a motion to certify a class.

**{¶ 64}** In ruling on the motion to strike, the trial court noted the standard for Civ.R. 23(D) situations but then discussed other standards related to evaluating certification motions under Civ.R. 23(A) and (B). *See* Class Decision at p. 8-11. As the trial court indicated, these standards involve a rigorous analysis and consideration of matters other than the complaint. *Id.* at p. 8. Moreover, rather than simply relying on allegations in the complaints, the parties here submitted factual materials and expert reports relevant to the motion to strike and referred to these materials during their arguments. This was appropriate, since the parties had already extensively briefed the certification issue and the trial court had already denied summary judgment. Nonetheless, the trial court failed to consider any evidence.

**{¶ 65}** The court did mention Plaintiffs' argument "that CareSource's motion to strike should be denied because they [Plaintiffs] have set forth sufficient facts and other *evidence* establishing that class certification is warranted in the instant case." (Emphasis added.) *Id.* at p. 7. However, as noted, the court never actually considered any evidence. The court also remarked that a party "seeking to maintain a class action pursuant to Civ.R. 23 'bears the burden of demonstrating by a preponderance of the evidence that the proposed class meets each of the requirements set forth in the rule.' " *Id.* at p. 9, quoting *Cullen*, 2013-Ohio-4733, at ¶ 15. Again, despite making this statement, the court never discussed the evidence that Plaintiffs submitted – or even the evidence that CareSource presented.

**{¶ 66}** Furthermore, the trial court failed to consider the prior summary judgment decision. The court briefly mentioned the decision and CareSource's claim that it, in

conjunction with the allegations in the SAC, precluded class certification. However, the court did not discuss the content of the summary judgment decision. *See* Class Decision at p. 5-6. Instead, the court focused only on allegations. Again, this was not the rigorous analysis that was needed. And while a failure on one point of certification causes a class to fail, the trial court addressed the simplest and most easily satisfied prong, i.e., whether the class could be identified. As we have stressed, in making this assessment, the court incorrectly focused on the predominance criterion, which differs from class definition.

{¶ 67} Based on the preceding discussion, the first assignment of error is sustained. We express no view on the potential outcome on remand.


### III.  Consideration of All Civ.R. 23 Factors

{¶ 68} Plaintiffs' second assignment of error states that;

> The Trial Court Also Erred by Granting Appellee's Motion to Strike Class Allegations Without Also Rigorously Analyzing Whether Appellants Satisfied Rule 23's Prerequisites for Class Certification.

{¶ 69} Under this assignment of error, Plaintiffs contend that the trial court erred in granting CareSource's motion to strike without considering the remaining factors under Civ.R. 23. They maintain that if the court had done so, it would then have correctly considered the submitted evidence and stipulation rather than just unrelated allegations in the pleadings. Due to our disposition of the first assignment of error, we need not address this assignment of error.

## IV.   Conclusion

**{¶ 70}** The judgment of the trial court is reversed, and this cause is remanded for further proceedings.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.